THE ALBEMARLE PAPER MANUFACTURING COMPANY, PETITIONER, *v.* RENEGOTIATION BOARD, RESPONDENT.

Docket No. 946–R. Filed December 23, 1960.

*H. Brice Graves, Esq.,* and *Lawrence E. Blanchard, Jr., Esq.,* for the petitioner.

*William E. Nelson, Esq.,* for the respondent.

ARUNDELL, *Judge:* Petitioner contests a determination of excessive profits in the amount of $68,396 from contracts and subcontracts subject to the Renegotiation Act of 1951 for its fiscal year ended March 30, 1952, as set forth by the respondent in its notice of order after review, dated August 15, 1956, and the order after review of the same date.

The parties have stipulated that:

The issue in this proceeding is limited to the question of whether Albemarle is entitled to a cost allowance under Section 106(b) of the Renegotiation Act of 1951 (herein referred to as the Act) measured by the market value of the woodpulp (in mat form) used in the manufacture of the paper and paper products sold under contracts subject to renegotiation. If Albemarle is entitled to such cost allowance, respondent agrees that there are no excessive profits. If it is not entitled to such cost allowance, petitioner agrees that the amount of the excessive profits is $81,000 before the allowance for State income taxes and $73,352 after State income taxes, in both instances before the credit for federal income and excess profits taxes.

FINDINGS OF FACT.

The stipulated facts are so found and are incorporated herein by this reference.

Albemarle Paper Manufacturing Company (herein referred to as Albemarle) is a Virginia corporation organized in 1887 with its principal office and place of business located in Richmond, Virginia.

Albemarle owns all the outstanding capital stock of Halifax Paper Company, Inc. (herein referred to as Halifax), a Virginia corporation with its principal operating plant located in Roanoke Rapids, North Carolina. Albemarle also owns all the outstanding capital stock of Seaboard Manufacturing Company (herein referred to as Seaboard), a Virginia corporation with its principal office and place of business located in Richmond. All such corporations are on a fiscal year accounting period ending on the last day of the week closest to March 31. For the fiscal year ended March 30, 1952, renegotiation proceedings under the Renegotiation Act of 1951 were conducted on a consolidated basis, including Albemarle, Halifax, and Seaboard. The consolidated group will be referred to herein as petitioner.

Petitioner is engaged in the manufacture of pulp, kraft paper, and miscellaneous paper products. The paper is manufactured from woodpulp, which is impure cellulose composed of the vegetable fibers in the wood.

Woodpulp is manufactured principally from pine trees. Petitioner owns or controls by lease timberlands on which pine trees native to the area are cultivated and harvested for use at the Halifax pulpmill in Roanoke Rapids. In 1952 petitioner owned or controlled by lease approximately 120,000 acres of timberland.

With respect to petitioner, the pulp process starts with the pine seed. These seed are distributed and planted by nature in the majority of cases and grow without cultivation into pine trees. The present industry trend is to plant the pine seed and grow seedlings in a nursery. These seedlings are then transplanted on timberlands owned or controlled by petitioner or distributed to farmers within the wood procurement area of petitioner. The growing of pine trees as a crop provides a source of cellulose fiber or pulp within the general wood procurement area of petitioner.

After a growing period of 15 to 20 years, the trees are ready for their first harvest in the form of a pulpwood thinning cut. The trees are felled, cut into 5-foot lengths, and shipped to the pulpmill of Halifax for processing. Pulpwood cut into 5-foot lengths has an established market for use in the manufacture of pulp. Pulpwood is usually referred to simply as "pulpwood" or sometimes as "bolts" but not customarily as "logs"; logs contemplate in usual parlance in the timber industry lengths in excess of 5 feet, primarily for use in the sawtimber industry. The ownership of land and tree farming by petitioner is primarily to insure an available supply of cellulose fiber usable by the pulp and papermills when pulpwood from outside sources is in short supply. In order to conserve its own supply of pulpwood, only about 20 per cent of the pulpwood requirements of petitioner was filled from petitioner's lands in 1952. The remaining pulpwood used by petitioner in that year was purchased from others.

Woodpulp is essentially cellulose, derived from coniferous wood, that has been chemically and physically separated out by a digestion and screening treatment to a commercial, salable state. The digestion process is the treatment of wood, in the form of chips, in a pressure vessel called a digester, under controlled conditions of temperature, pressure, and time, with the addition of a liquor composed mainly of an aqueous solution of sodium hydroxide and sodium sulphide. The purpose of the digestion is to dissolve the interfiber bonding materials or the noncellulosic portion of the wood, leaving the cellulose as a fibrous residue. The pulp is then washed essentially free of spent liquor in countercurrent washers and further purified by means of special centrifugal screens that remove extraneous impurities of incompletely digested chips, bark, and dirt.

The resulting pulp stock, in a then semiliquid, slush state, can be pumped to paper machines or can be dewatered and collected in mats of about 48 inches by 24 inches and about one-half inch thick, consisting of a mass of cellulose fiber containing about 50 per cent water. In this form the pulp is customarily put on pallets and banded for shipment. The pulp in this matted form has an established market for use in the manufacture of paper, and petitioner from time to time purchases large quantities of pulp on the open market, including some quantities in 1952. Also, Halifax sold to unaffiliated purchasers 12,903 tons of pulp from the total of 85,271 tons which it produced in 1952.

Albemarle has no equipment in Richmond for extracting pulp from pulpwood and all its paper manufactured in Richmond is made from pulp mats shipped from the plant in Halifax or purchased on the open market.

Pulp, once dewatered, is subsequently put back into slush form by processing it through breaker beaters with the addition of water. After being put into slush form, pulp can be blended with various ingredients, and then the pulp flows onto the wire of the paper machines for subsequent dewatering, drying, calendering, and winding into rolls of finished kraft paper.

The pulpwood used in paper manufacture is cut from trees ranging in diameter from about 4 inches upwards to trees sometimes over 20 inches in diameter but ordinarily, as an economic matter, trees over 12 to 14 inches are usually sold to a sawmill rather than a paper manufacturer. Saw logs, or lumber, are generally cut from trees with diameters of 8 inches and upwards.

Of the total amount of southern pine cut in 1952 from the entire south, about 52 per cent went into saw logs, or lumber, 31 per cent into pulpwood, 11 per cent into fuelwood, 3 per cent into poles and piling, and the remaining 3 per cent into a large number of minor products.

In the year under review, about 64 per cent of the timber cut from southern pine in North Carolina, in which petitioner's pulp plant was located, went into saw logs, about 18 per cent went into pulpwood, and about 18 per cent into other minor products. In Virginia, in which petitioner's paper factory was located, about 58 per cent of the southern pine timber went into saw logs, about 24 per cent went into pulpwood, and about 18 per cent was used for all other products.

For the United States as a whole in 1952, about 52 per cent of the timber cut went into saw logs, 22 per cent into pulpwood, 16 per cent into fuelwood, 4 per cent into veneer-plywood, and 6 per cent into other products.

Paper is made not only from woodpulp but from a wide variety of other products such as asbestos, linen, flax, bamboo, tobacco stems, rags, and all manmade fibers.

In the United States, of a total of 484 million acres of forest land, 23 million acres are owned by pulp and paper companies, 35 million acres by lumber companies, about 300 million acres by other private holdings, and about 126 million acres by various governmental agencies.

Petitioner is an integrated paper manufacturer in that it owns a substantial amount of its timber requirements and produces a substantial amount of the pulp used in its manufacturing operations. Paper manufacturing starts with pulp. Many paper manufacturers do not have pulp-manufacturing facilities and purchase their pulp requirements from others.

## OPINION.

The solution of the issue in this case depends upon the determination of the meaning of the terms "the first form or state suitable for industrial use" of the "product of * * * timber" appearing in section 106(a)(3) and (b) of the Renegotiation Act of 1951, printed in the margin.[1]

---

[1] SEC. 106. EXEMPTIONS.

(a) MANDATORY EXEMPTIONS.—The provisions of this title shall not apply to—

* * * * * * *

(3) any contract or subcontract for the product of a mine, oil or gas well, or other mineral or natural deposit, or timber, which has not been processed, refined, or treated beyond the first form or state suitable for industrial use;

* * * * * * *

(b) COST ALLOWANCE.—In the case of a contractor or subcontractor who produces or acquires the product of a mine, oil or gas well, or other mineral or natural deposit, or timber, and processes, refines, or treats such a product to and beyond the first form or state suitable for industrial use, or who produces or acquires an agricultural product and processes, refines, or treats such a product to and beyond the first form or state in which it is customarily sold or in which it has an established market, the Board shall prescribe such regulations as may be necessary to give such contractor or subcontractor a cost allowance substantially equivalent to the amount which would have been realized by such contractor or subcontractor if he had sold such product at such first form or state. * * * [Emphasis supplied.]

Petitioner contends that the statutory test of "the first form or state suitable for industrial use" must be applied in relation to the industry in which the "product of * * * timber" is used, and that in the paper-manufacturing industry such first form or state is wood-pulp (in mat form).

The Renegotiation Board determined in accordance with its regulations, section 1453.2(b)(3)(i),[2] that the first form or state suitable for industrial use of the product of timber was "Standing timber, logs, logs sawed into length, and logs with or without bark."

Petitioner agrees that the above provision of the regulations is a correct interpretation of the statute with respect to industries making products of wood, such as lumber, furniture, or boxes, but that the interpretation is invalid as applied to the paper industry. In its brief, it states that "Both expert witnesses testified that pulpwood is not commonly referred to as logs" and that "This is a strong indication that the Renegotiation Board overlooked the use of timber in the paper industry when it prepared the definition in question for the word always applied to wood used to make pulp is 'pulpwood.'"

It may be true that pulpwood is not commonly referred to as logs but this we think is wholly immaterial. The simple fact is that the timber is in the form of a log before it is cut into the 5-foot pulpwood lengths. The parties stipulated that:

> After a growing period of 15 to 20 years the trees are ready for their first harvest in the form of a pulpwood thinning cut. The trees are felled, cut into 5-foot lengths and shipped to the pulp mill of Halifax for processing. Pulpwood cut into 5-foot lengths has an established market for use in the manufacture of pulp.

It would seem from this stipulation that the term "pulpwood" is but another name for logs cut into 5-foot lengths, and clearly falls within the description of "logs, logs sawed into length, and logs with or without bark," and as such constitutes a product of timber in the first form or state suitable for industrial use, as is stated in the regulations, *supra*.

---

[2] (3) *List of exempt raw materials.*—(1) The Board has determined that the following products are exempt under section 106(a)(3) of the act and subparagraph (2) of this paragraph when they represent products of a mine, oil or gas well, or other mineral or natural deposit, or timber, which have not been processed, refined or treated beyond the first form or state suitable for industrial use, *and are not exempt if manufactured from raw materials which do not fall within the above description or which have at some prior stage been processed, refined or treated beyond such first form or state suitable for industrial use.* * * *

(ii) This list is not intended to be comprehensive, but is being promulgated as a guide to contractors in completing the Standard Form of Contractor's Report, prescribed in § 1470.3(a) of this subchapter. The Board may from time to time add to the list, or revise it if errors are found.

*Raw Materials Exemption List*

\*          \*          \*          \*          \*          \*          \*

Standing timber, logs, logs sawed into length, and logs with or without bark. [Emphasis supplied.]

Petitioner further contends and argues that if the above regulations be intended to apply to timber used in the paper industry, then the regulations are invalid.

In our opinion, the regulations are consistent with the statute and are reasonable. Here, the pulpwood used to make the woodpulp (in mat form) was first standing timber. The trees were felled and after trimming off the branches and tops, the long log was cut into shorter logs 5 feet in length. In that state or form they had an established market and were suitable for industrial use. The statute did not require that in such state or form they be suitable for any particular industry. Logs sawed into length could be used for several purposes other than as pulpwood. If large enough in diameter, they could be used for lumber, or if not usable for lumber, they could be used for poles, posts, props, fuel, naval stores, and other uses.

Furthermore, the regulations have been in effect for more than 15 years and should be given the force and effect of law unless "plainly and palpably inconsistent with the law." *Boske* v. *Comingore*, 177 U.S. 459, 470 (1900); *Rigby* v. *Rasmussen*, 275 F. 2d 861, 863 (C.A. 10, 1960). Regulations which are consistent with the law and reasonable, as we believe these regulations to be, should not be overruled except for weighty reasons. *Fawcus Machine Co.* v. *United States*, 282 U.S. 375, 378 (1931); *Commissioner* v. *South Texas Co.*, 333 U.S. 496, 501 (1948). We hold that the regulations are valid and that the first form or state suitable for industrial use of the product of timber is as stated in the regulations and not "woodpulp (in mat form)" as contended for by the petitioner.

It follows that petitioner is not entitled to the cost allowance contended for by it and that, as stipulated, "the amount of the excessive profits is $81,000 before the allowance for State income taxes and $73,352 after State income taxes, in both instances before the credit for federal income and excess profits taxes."

*Decision will be entered under Rule 50.*