GREENLAND CONTRACTORS, A JOINT VENTURE, AGENT,[1] PETITIONER *v.* RENEGOTIATION BOARD, RESPONDENT

Docket No. 1048–R.    Filed February 9, 1970.

*Numa L. Smith, Jr., Barron K. Grier, Clarence Kipps, Jr.,* and *John W. Nolan,* for the petitioner.
*Irwin Goldbloom,* for the respondent.

#### OPINION

KERN, *Judge:* Respondent has determined by an order dated May 19, 1966, that petitioner, a consolidated group of four joint ventures, realized excessive profits in the amount of $7,500,000 ($7,443,907 after adjustment on account of income taxes other than Federal income taxes) from contracts and subcontracts allegedly subject to the Renegotiation Act of 1951 for the fiscal year ended December 31, 1961.

Before this case was called for trial, the parties jointly moved this Court for an order which was granted setting this proceeding for a trial limited to the following issues:

1. Whether receipts and accruals in the approximate amount of $18,872,000 received or accrued by petitioner for its fiscal year ended December 31, 1961, as contractor or subcontractor under Contract numbered DA–30–347–ENG–137 through modification number 22, are exempt from renegotiation under sections 106(a)(7) and 106(a)(9) of the Renegotiation Act of 1951, as amended, 50 U.S.C. App. 1216(a)(7); 1216(a)(9) and applicable regulations issued under the Act.

---

[1] The petitioner in these proceedings is composed of four joint ventures, identified herein, who have been consolidated for renegotiation under the Renegotiation Act of 1951 and respondent's regulations. Pursuant to respondent's regulations, Greenland Contractors was designated as the agent for the consolidated group.

2. Whether receipts and accruals in the approximate amount of $9,937,000 received or accrued by petitioner as contractor or subcontractor for its fiscal year ended December 31, 1961, under change orders, supplemental agreements or other modifying instruments to Contract DA–30–347–ENG–290 are exempt from renegotiation under sections 106(a)(7) and 106(a)(9) of the Renegotiation Act of 1951, as amended, 50 U.S.C. App. 1216(a)(7) ; 1216(a)(9), and applicable regulations issued under the Act.

The petitioner reserves the right to assert the nonapplicability or invalidity of any regulations issued by respondent under the Renegotiation Act of 1951, as amended.

In a "Stipulation with Respect to Limited Issues" and in a later stipulation, the parties have agreed between themselves upon the alternative actions to be taken by this Court depending upon our resolution of the issues in controversy.[2]

When this case was called for trial, the parties submitted this case on a complete stipulation of facts pursuant to Rule 30 of the Rules of Practice of this Court. All of the stipulations and the exhibits attached thereto are incorporated herein by this reference and are adopted as our findings of fact. For reasons which will be discussed below, we deny respondent's motion to strike from the record of this case the stipulations and exhibits relating to events preceding the ultimate award of Contract DA–30–347–ENG–137.

We set forth below a summary of the pertinent general facts. We shall set forth the facts pertinent to each of the limited issues raised by the parties in the respective portions of this opinion in which we discuss each of these issues.

### GENERAL FINDINGS OF FACT

The petitioner is a related group composed of the following four joint ventures : (a) Greenland Contractors, a joint venture, composed of Peter Kiewit Sons' Co., S. J. Groves & Sons Co., Al Johnson Construction Co., and Condon-Cunningham, Inc. (hereinafter referred to as Greenland Contractors) ; (b) Peter Kiewit Sons' Co. and Al Johnson Construction Co., a joint venture (hereinafter referred to as the 290 Contractor) ; (c) Peter Kiewit Sons' Co., doing business as Greenland Contractors, a joint venture, composed of Peter Kiewit Sons' Co. and Al Johnson Construction Co. (referred to by the parties

---

[2] If our decision is in favor of petitioner on both disputed issues the parties have stipulated that the Court should enter an order determining that petitioner realized excessive profits of $1,250,000. If our decision is in favor of petitioner on the first of such issues but against petitioner on the second issue then the amount of excessive profits to be determined should be $4,250,000. If our decision is in favor of petitioner on the second issue and against petitioner on the first, then the amount of excessive profits to be determined is $4,500,000. If our decision is against petitioner on both issues, then the amount of excessive profits to be determined is $7,500,000. All such determinations of excessive profits are to be subject to applicable credits for State and Federal taxes.

as the 383 Contractor) ; and (d) Greenland Contractors, a joint venture, composed of Peter Kiewit Sons' Co., S. J. Groves & Sons Co., Al Johnson Construction Co., and Condon-Cunningham, Inc. (referred to by the parties as the 383A Contractor). Only the first two joint ventures (Greenland Contractors and the 290 Contractor) are involved in the limited issues before the Court in these proceedings.

Pursuant to section 105(a) of the Renegotiation Act of 1951, as amended, 50 U.S.C. App. sec. 1215(a), and section 1464 of respondent's regulations, 32 C.F.R. sec. 1464, renegotiation of the above-named joint ventures for the fiscal year ended December 31, 1961, has been and is to be conducted on a consolidated basis. Pursuant to such regulations, Greenland Contractors was designated as the agent for the consolidated group.

Each joint venture comprising the petitioner kept its books and filed its tax returns on the completed-contract method, and the petitioner's method of accounting for renegotiation is also the completed-contract method.

The contracts involved in this proceeding are fixed-price contracts bearing the designations DA–30–347–ENG–137 (hereinafter referred to as Contract 137) and DA–30–347–ENG–290 (hereinafter referred to as Contract 290). The Eastern Ocean District Engineer, Corps of Engineers, U.S. Army, awarded and administered both of these contracts.

### Issue 1. Contract 137

Contract 137 was awarded to Greenland Contractors—Danish Arctic Contractors Joint Venture (hereinafter referred to as GC–DAC) on December 29, 1955, at the price of $18,176,836. Contract 137 required construction of runways, taxiways, parking facilities, and buildings and the renovation of existing buildings at Thule and Sondrestronfjord Air Base in Greenland for use by the Strategic Air Command. GC–DAC subcontracted the work under Contract 137 at the same unit prices as appeared in the prime contract. Part of such work ($14,834,-348) was subcontracted to and performed by Greenland Contractors and the balance ($3,342,488) was subcontracted to and performed by Danish Arctic Contractors.

The $18,872,000 figure set forth in paragraph 1 of the parties' joint motion for limiting issues as the amount received or accrued by the petitioner was received or accrued by Greenland Contractors as subcontractor under Contract 137. The $18,872,000 represents the aggregate of the original subcontract price ($14,834,348) and the price

received for work under Modifications 1 through 22 of Contract 137 ($4,037,652).[3]

The issue before us concerning Contract 137 is whether or not GC-DAC's prime Contract 137, as originally awarded on December 29, 1955, is exempt from renegotiation under section 106(a)(9) of the Renegotiation Act of 1951, 50 U.S.C. App. sec. 1216(a)(9). That section provides as follows:

(a) Mandatory Exemptions.—The provisions of this title shall not apply to—

\* \* \* \* \* \* \*

(9) any contract, awarded as a result of competitive bidding, for the construction of any building, structure, improvement, or facility, other than a contract for the construction of housing financed with a mortgage or mortgages insured under the provisions of title VIII of the National Housing Act, as now or hereafter amended.

---

[3] Contract 137, as used herein, refers to Contract 137 as awarded on Dec. 29, 1955. Modifications 1 through 22 relate to the work involved in Contract 137 as awarded on Dec. 29, 1955.

After Contract 137, including Modifications 1 through 22, was substantially completed, the Corps of Engineers, after two advertisements and bid rejects, awarded Greenland Contractors the Rising Star project after negotiations with Greenland Contractors. The Rising Star project called for the construction of Nike Hercules Missile sites some several miles north and some several miles south of Thule in Greenland. The agreement to perform the Rising Star work was between the Corps of Engineers and Greenland Contractors and contained an incentive price revision clause which allowed Greenland Contractors to increase its profit if actual costs were below target costs and required Greenland Contractors to decrease its profit if costs exceeded target costs. DAC was not a party to this agreement but performed part of the Rising Star job as a subcontractor to Greenland Contractors. The formal contractual vehicle for the Rising Star Project consisted of Modifications 23 through 64 to Contract 137 which, because of the nonparticipation of DAC as a prime contractor, became with respect to the Rising Star project a contract between the Corps of Engineers and Greenland Contractors. Modification 23, dated Jan. 22, 1957, effected the transfer of Contract 137 between the Corps of Engineers and GC-DAC to Greenland Contractors.

The Corps of Engineers, in 1958, awarded an additional project to Greenland Contractors, the work consisting of the construction relating to the ballistic missile early warning system (BMEWS) located about 12 miles east of Thule, and at a higher elevation than Thule, in Greenland. The agreement to perform this work was also between the Corps of Engineers and Greenland Contractors and contained a price redetermination clause permitting a downward adjustment only of the price. The BMEWS work was performed under Modifications 65 through 178 to Contract 137. The price paid to the prime contractor for Modifications 24 through 178 to Contract 137 totaled approximately $128,331,000.

Respondent renegotiated GC-DAC for 1961 and in accordance with its regulations granted a clearance dated May 20, 1966. This clearance was based on the fact that GC-DAC paid out to its subcontractors (Greenland Contractors and Danish Arctic Contractors) all funds received by it under the prime contract. The parties have stipulated that this clearance does "not imply any determination by the respondent that the prime contract is exempt under section 106(a)(9) of the [Renegotiation] Act of [1951]."

In the instant consolidated renegotiation proceedings the respondent determined that the 137 Contractor had realized excessive profits on Contract 137, including all modifications, in the amount of $3,250,000 ($3,200,119 after adjustment for income taxes other than Federal taxes). In respondent's "Statement of Facts and Reasons" accompanying its "Order Determining Excessive Profits," respondent states that the ratio of profits to revenues with respect to Contract 137, through Modification 22, was 31.3 percent, and that the ratio of profits to revenues with respect to Contract 137, Modifications 23 through 178, was 12.9 percent. In their "Stipulation with Respect to Limiting Issues," the parties apparently have agreed that respondent's determination of excessive profits with respect to Contract 137, including all modifications, will depend entirely on our decision as to whether Contract 137 was originally awarded as a result of competitive bidding.

The parties have stipulated that "contract 137 was for the construction or installation of the whole, or an integral part of a building, structure, improvement, or similar facility, and was not for the construction of housing financed with a mortgage or mortages insured under the provisions of Title VIII of the National Housing Act, as then or thereafter amended."

The stipulated evidence shows that prior to the award of Contract 137 the following events occurred:

In August 1955, by means of an intra-agency memorandum addressed to the "Chief of Engineers, Department of the Army," the Eastern Ocean District Engineer, Corps of Engineers, U.S. Army, sought and obtained authority from the Chief of Engineers to solicit "fixed price proposals for air base construction * * * in Iceland" from selected prequalified contractors. This request, formally designated as "Request for Authority to Negotiate and Award a Fixed Price Contract with Limited Bidders," reads in pertinent part as follows:

3. The proposals are to be opened at the stated time in the presence of the contractors submitting the proposals. If the lowest proposal received is in the judgment of the Contracting Officer, acceptable and considered to be in the best interests of the Government, a contract will be awarded. If the Contracting Officer is unable to accept the low proposal, Contracting Officer will enter into negotiations with the next lowest proposer and conduct negotiations in turn in an attempt to arrive at an agreeable price.* Contract to be awarded is to be a negotiated contract on Government Standard Form No. 23, Revised March 1953, with additional provisions to cover the special conditions pertaining to the work. * * *

4. Authority is requested for the Contracting Officer to award the contract to the lowest bidder. This authority is requested in the interest of saving time as it is essential that work be placed under contract on or about 15 November 1955 because of the complexity of transfer of responsibility between the present CPFF contractor and the Fixed Price Contractor.

5. Reasons for limited bidding are:

a. This method will insure obtaining a competent contractor with experience and technical qualifications in the performance of this type of work in overseas areas.

b. The use of limited bidding procedure will serve as prequalification for contractor and will, therefore, serve the interests of the U.S. Government in the conduct of meetings for future allocation of work.

c. Proposals through competition will insure that the Government is receiving the lowest price to perform subject work.

---

*This sentence was later modified to conform to a directive from the Office of the Chief of Engineers, Washington, D.C., reciting as follows:

2. Contrary to the statement in the third sentence of paragraph 3 of the basic letter, if the low proposal as submitted is not acceptable, the Contracting Officer will first enter into negotiations with that low proposer. If negotiations with that contractor are not successful, that negotiation will be terminated and negotiations then entered into with the next lowest proposer, and so on, until an acceptable contract is negotiated or it is determined that it is not possible to negotiate a satisfactory contract with any of the proposers.

d. A total of twenty-five (25) American contractors and six (6) Danish contractors is considered optimum to stimulate contractor interest and will be adequate to insure competition.

e. This plan will save time and insure that award is made as scheduled on 15 November 1955.

By letter dated August 26, 1955, the district engineer sent a notice of his intention to issue "invitations" on or about September 15, 1955, for "proposals" for the work required by Contract 137. That notice was sent to 32 prospective bidders. These were "prequalified contractors" who were selected on the basis of the Department of the Army's knowledge of their responsibility, integrity, and ability to perform the essential defense work for which proposals were being solicited and in order to avoid the delays inherent in such preaward surveys as would have been necessary had proposals been received from firms whose qualifications were unknown. It was not the intent of the Government to limit full and free competition, and provisions were included in the information for bidders for the participation of additional firms as joint ventures or subcontractors, subject to the approval of the contracting officer. Moreover, public announcement of the prospective work was given by conspicuous posting of the invitations in the office of the district engineer.

The district engineer conducted a briefing conference for interested bidders on September 15–16, 1955, at which time a document entitled "Information For Bidders," a document entitled "Invitation For Fixed Price Proposals," the drawings and specifications of the work to be performed, and the proposed contract document were given to the bidders and reviewed. The "Invitation For Fixed Price Proposals" was given to 21 of the prequalified contractors who attended the conference. The other 11 contractors had indicated, in response to the district engineer's August 26, 1955, notice, that they did not desire to participate.

The "Invitation For Fixed Price Proposals" dated September 15, 1955, provided in part as follows:

1. *Sealed proposals* in duplicate, for furnishing all plant, labor, equipment, appliances, and materials, except that to be furnished by the Government, and performing all work for the project described in the drawings and specifications will be received until 11:00 A.M., E.S.T., 15 November 1955, in the Office of the District Engineer, Eastern Ocean District, 346 Broadway, New York 13, New York, and then opened. Attendance at the opening will be limited to those submitting proposals and representatives of the Government. The total amount of each proposal submitted will be announced. If the lowest proposal received is, in the opinion of the Contracting Officer, acceptable to the Government, a contract may be awarded. In the event that no intention to award is indicated on opening of proposals, negotiations will be initiated with the firm or firms submitting the lowest responsive price proposal(s) for any one site or combination of sites. In the event that a mutually satisfactory contract cannot be consummated with the firm submitting the lowest responsive proposal, those negoti-

ations will be terminated and negotiations initiated with the firm submitting the next lowest responsive proposal. This procedure will be followed until a firm has been found with which a satisfactory contract can be negotiated. If, during negotiations, there is a material change in the work, all of the original offerors will be given an opportunity to submit new proposals.

\* \* \* \* \* \* \*

9. ANY PROPOSALS WHICH CONTAIN ANY EXCEPTIONS TO OR QUALIFICATIONS OF THE PROPOSAL CONDITIONS AND DOCUMENTS WILL BE DISQUALIFIED AND WILL NOT BE CONSIDERED.

The proposal form required by the "Invitation For Fixed Price Proposals" provided in part as follows:

In compliance with your invitation for fixed-price proposals of the above date, the undersigned hereby proposes to furnish all plant, labor, equipment, appliances, and materials except such plant, materials, equipment, appliances, and services to be furnished by the Government as indicated in the special conditions and technical provisions of the contract and perform all work for Construction of Facilities at various locations in Greenland in strict accordance with the specifications, schedules, drawings, and conditions for the consideration of the amounts set forth in the attached Unit Price Schedule, and agrees that upon written acceptance of this proposal, mailed, or otherwise furnished, within _____ calendar days (30 calendar days unless a shorter period be inserted by the invited firm) after the date of opening of proposals, he will within 5 calendar days (unless a longer period is allowed) after receipt of the prescribed forms, execute the Construction Contract, and give performance bond and payment bond on Government Standard forms, if these bonds are required, with good and sufficient surety or sureties. The undersigned agrees that if awarded the contract, he will commence the work on 1 February 1956, and that he will complete the work within the time specified in Paragraph SC–1 of Part III—SPECIAL CONDITIONS.

The parties have stipulated that "The Corps of Engineers allowed sufficient time prior to the opening of 'proposals' to prepare and submit the 'proposals.' " The Corps of Engineers also conducted a site-viewing trip in Greenland for interested contractors from September 27 through October 6, 1955. Contractors' questions and the district engineer's answers thereto were reduced to writing and furnished to all of the interested contractors.

The parties have also stipulated that "The detailed drawings and specifications and the invitation, along with the addenda and memoranda, made available to the prequalified contractors were as descriptive and complete and of the same type as those normally used in a formally advertised contract."

Four addenda were issued by the district engineer making changes in the documents issued to the interested contractors. Addendum No. 4 deleted some of the work originally to be awarded under Contract 137 and postponed the opening of the sealed proposals to 11 a.m., e.s.t., November 16, 1955, unless all firms submitting proposals waived postponement of the opening of the proposals at 11 a.m., e.s.t., Novem-

184

ber 15, 1955. Addendum No. 4 was handed to the proposers on November 15, 1955, and all of them waived postponement of the opening.

Three sealed proposals, in duplicate, were received by 11 a.m., e.s.t., November 15, 1955, in the Office of the District Engineer, Eastern Ocean District, 346 Broadway, New York, N.Y. At that time each proposal was opened and the total amount of each proposal was announced to those present in accordance with the "Invitation For Fixed Price Proposals." GC–DAC's proposal did not contain any exceptions to or qualifications of the proposal conditions and documents and conformed to the documents issued to interested contractors. The three proposals, received and publicly opened in accordance with the "Invitation For Fixed Price Proposals," were as follows:

| | |
|---|---|
| Oman-Farnsworth-Wright | $22, 906, 841 |
| Grove, Shepherd, Wilson & Kruge | 20, 249, 378 |
| GC–DAC (a joint venture) | 18, 266, 813 |

A conference was conducted by the district engineer on November 17–18, 1955. Among the matters discussed were a list of questions submitted by GC–DAC and the prices of certain of the pay items in the proposal which, in the view of the district engineer, appeared to be excessive. During a substantial part of the conference the participants discussed inventories of Government materials, spare parts, and equipment. At this conference the district engineer agreed to modify the contract in accordance with GC–DAC's request to locate its office in Trenton, N.J., close to the airport of embarkation, rather than in New York City as required by article 47 of the contract, provided that GC–DAC install and maintain a direct telephone line to the district engineer's office at no cost to the Government. The conference resulted in no change in the contract price or in any contract terms, other than the stateside office location, and was concluded with the question by the district engineer as to whether petitioner would adjust the price below that contained in the proposal to which petitioner's representative gave a negative answer. Thereupon without further discussion the district engineer stated by way of conclusion that "the Government is satisfied that the price * * * offered [in petitioner's proposal] to do the work is reasonable."

The district engineer determined that GC–DAC's November 15, 1955, proposal was the most advantageous to the Government, price and other factors considered. At the request of the district engineer, the time specified in the "Invitation For Fixed Price Proposals" for acceptance of GC–DAC's November 15, 1955, proposal was extended 15 days to December 30, 1955, by a letter agreement dated December 14, 1955, and again 17 days to January 16, 1956, by a letter agreement dated December 27, 1955. Contract 137 was awarded to GC–DAC

on December 29, 1955, by a letter from the district engineer which notified GC–DAC that its November 15, 1955, proposal was accepted.

The Contract 137 price of $18,176,836 was the amount of GC–DAC's November 15, 1955, proposal ($18,266,813), less the costs of performance and payment bonds in the total amount of $89,977 which were waived by the Corps of Engineers as permitted by the "Invitation For Fixed Price Proposals."

The opening textual paragraphs on page 2 of Contract 137 provide as follows:

This contract is authorized and negotiated pursuant to the provisions of Title II of the First War Powers Act, 1941, as amended, and the Executive Order 10210 dated 2 February 1951, as amended; Section 2(c) (1) of the Armed Service Procurement Act, Public Law 413, 80th Congress and Presidential Proclamation 2914.

THIS CONTRACT, entered into this 29th day of December 1955, by the United States of America, hereinafter called the Government, represented by the Contracting Officer executing this contract, and the corporations, and the partnership named above, constituting a joint venture, hereinafter called the Contractor, witnesseth that the parties hereto do mutually agree as follows: * * *

Title II of the First War Contracts Act, 1941, stated that "The President may authorize any department or agency of the Government, exercising functions in connection with the national defense, * * * to enter into contracts * * * without regard to the provisions of law relating to the making * * * of contracts whenever he deems such action will facilitate the national defense" under regulations prescribed by the President. The statute contains certain provisos, including the proviso "that nothing herein shall be construed to authorize any contracts in violation of any law relating to limitation of profits." As in effect in late 1955, the statute appears at 50 U.S.C. App. sec. 611 (1952).

In Executive Order No. 10,210, dated February 2, 1951 (3 C.F.R. 390 (1951)), President Truman exercised the power delegated to him under title II of the First War Powers Act, 1941. The Executive order gave the Secretary of Defense authority to prescribe regulations under title II, permitted successive delegations of authority to enter into contracts under that statute, stated that advertising and competitive bidding are not required in entering such contracts and provided that nothing contained within the order shall prejudice any authority to utilize the provisions of the Armed Services Procurement Act of 1947 and regulations thereunder.

Section 2(c) (1) of the Armed Services Procurement Act, 62 Stat. 21 (1948), states that among the purchases and contracts for supplies not required to be made pursuant to formal advertising by the Department of the Army, and certain other departments, are those purchases and contracts "determined to be necessary in the public interest

during the period of a national emergency declared by the President or by the Congress."

In Presidential Proclamation No. 2914, dated December 1950 (3 C.F.R. 99 (1950)), President Truman proclaimed the existence of a national emergency resulting from the events giving rise to the Korean conflict.

As we have indicated, the ultimate question presented for our decision with regard to this issue is whether Contract 137 is exempt from renegotiation because it was awarded "as a result of competitive bidding" within the meaning of that phrase as it is used in section 106(a) (9) of the Renegotiation Act of 1951, as amended.

If GC–DAC's prime Contract 137 is exempt from renegotiation under section 106(a)(9), then Greenland Contractor's subcontract with GC–DAC is also exempt from renegotiation by reason of section 106(a)(7) of the Renegotiation Act of 1951, 50 U.S.C. App. sec. 1216(a)(7), which is set forth in the margin below.[4]

Section 106(a)(9) was first enacted in 1955 by Pub. L. No. 216, 84th Cong., 1st Sess. (Aug. 3, 1955), 69 Stat. 447, as an amendment to the Renegotiation Act of 1951. This amendment added by the Senate was contained in section 3 of H.R. 4904, 84th Cong., 1st Sess., p. 3, as it was reported by the Senate Finance Committee on June 30, 1955. In connection with this amendment the following limitation was noted in S. Rept. No. 582, to accompany H.R. 4904 (Pub. L. No. 216), 84th Cong., 1st Sess., p. 3 (1955):

Section 3 of the bill, as amended by your committee, provides for a mandatory exemption of competitive-bid construction contracts. A similar exemption was contained in subsection (i)(1)(E) of the Renegotiation Act of 1943. As under the Renegotiation Act of 1943, the exemption is to be limited to contracts awarded in conformity with the requirements for procurement by formal advertising now set forth in the Armed Services Procurement Act of 1947. * * *

Consistent with the stated limitation, the respondent issued Renegotiation Board Regulation (hereinafter sometimes referred to as RBR) section 1453.7, 32 C.F.R. sec. 1453.7. RBR section 1453.7(b)(iii), 32 C.F.R. sec. 1453.7(b)(iii), provides that in order for a contract to be exempt from renegotiation, it must have been "awarded in conformity with the requirements for procurement by formal advertising set forth in section 3 of the Armed Services Act of 1947."

The Armed Services Procurement Act of 1947 was enacted on February 19, 1948. Section 3 thereof (ch. 65, sec. 3, 62 Stat. 22) provided as follows:

---

[4] (a) Mandatory Exemptions.—The provisions of this title shall not apply to—
*     *     *     *     *     *
(7) any subcontract directly or indirectly under a contract or subcontract to which this title does not apply by reason of any paragraph, other than paragraph (1), (5), or (8) [e], of this subsection; * * *

Whenever advertising is required—

(a) The advertisement for bids shall be a sufficient time previous to the purchase or contract, and specifications and invitations for bids shall permit such full and free competition as is consistent with the procurement of types of supplies and services necessary to meet the requirements of the agency concerned.

(b) All bids shall be publicly opened at the time and place stated in the advertisement. Award shall be made with reasonable promptness by written notice to that responsible bidder whose bid, conforming to the invitation for bids, will be most advantageous to the Government, price and other factors considered: *Provided*, That all bids may be rejected when the agency head determines that it is in the public interest so to do.

By section 15 of Public Law No. 268, enacted Aug. 9, 1955, 69 Stat. 551, section 3 of the Armed Services Procurement Act of 1947 was amended by adding at the end thereof the following new paragraph:

(c) All bids or invitations for bids shall contain in their specifications all the necessary language and material required and shall be so descriptive both in its language and attachments thereto in order to permit full and free competition. Any bid or invitation to bid which shall not carry the necessary descriptive language and attachments thereto, or if such attachments are not available or accessible to all competent, reliable bidders, such bid or invitation to bid shall be invalid and any award or awards made to any bidder in such case shall be invalidated and rejected.

Petitioner contends that since the procedures followed in awarding Contract 137 were in essential conformity with the requirements for procurement by formal advertising set forth in section 3 of the Armed Services Procurement Act of 1947, as in effect in late 1955 when Contract 137 was awarded to GC–DAC, then Contract 137 is exempt from renegotiation under section 106(a)(9) of the Renegotiation Act of 1951. Respondent on the other hand, contends that Contract 137 was by its terms a negotiated contract, that parol evidence may not be used to contradict the recitation in the contract that it was "negotiated" and that even if extrinsic evidence is admissible on this question, the extrinsic evidence "confirms the plain language of the contract, namely, that it was negotiated."

We shall first consider respondent's contention that we are precluded by the parol evidence rule from a consideration of any evidence relating to an examination of events prior to the award of the contract because Contract 137 states on its face that it is "negotiated" and recites that at least a part of the authority of the contracting officer to enter into the contract stems from section 2(c)(1) of the Armed Services Procurement Act of 1947, a provision which authorizes procurement by negotiation. We cannot agree. The statements in the preliminary or introductory paragraph of the contract to the effect that the contract was negotiated and authorized, at least in part, by a certain section of the Armed Services Procurement Act are not statements of promises representing the agreement of the parties to

the contract, are not words of present transfer or present discharge and are not statements as to "who are parties to and bound by [the written contract]" (see *Calif. Eastern Line, Inc.* v. *Maritime Commission,* 17 T.C. 1325, 1336, affd. 231 F. 2d 754 (C.A. D.C.), certiorari denied 352 U.S. 848). Since they are none of these but are in the nature of statements of fact, the parol evidence rule has no application as to evidence tending to show that the contract was in truth and in fact "awarded as a result of competitive bidding" rather than "negotiated." See Restatement, Contracts, sec. 244 (1932) ;[5] Williston, Contracts, secs. 115B and 632 (3d ed.). Indeed, only evidence extrinsic to the contract would normally be available in a consideration of whether a procurement contract was "awarded in conformity with the requirements for procurement by formal advertising" as contemplated by the Senate report quoted above. Certainly such an inquiry, necessary under the statute and clearly contemplated by Congress, should not be precluded by the inclusion of labels and conclusions in the introductory paragraph of a long and detailed procurement contract which in no way form the subject of a promise by either party or purport to bind both parties by a mutually shared contractual nexus.

Respondent's motion to strike the stipulations and exhibits containing such extrinsic evidence is denied. In our opinion the cases cited by respondent on this point (*Park Sherman Co.* v. *United States,* 29 T.C. 175; *Braden* v. *War Contracts Price Adjustment Board;* 11 T.C. 71; and *Calif. Eastern Line, Inc.* v. *Maritime Commission, supra*) are irrelevant to its argument.

Respondent next contends that even if such extrinsic evidence can properly be considered by us, this evidence relating to events preceding and contemporaneous with the award of Contract 137 is persuasive that this contract was negotiated and was not awarded as the result of competitive bidding. Petitioner contends, on the other hand, that an examination of such evidence shows that the procedures employed with respect to Contract 137 met all of the requirements and standards set for competitive bidding in section 3 of the Armed Services Procurement Act of 1947, as in effect in late 1955.

In its effort to show that Contract 137 was negotiated, respondent points to the fact that invitation was entitled "Invitation For Fixed Price Proposals" rather than the term of art "invitation for bids" used in the statute and the Armed Services Procurement Regulation in effect at that time, 32 C.F.R. sec. 2-201 (1955 ed.). Respondent also points to a number of internal documents of the Corps of Engineers and to written and oral communications between GC–DAC and the district engineer where the words "negotiate," "proposal" and other

---

[5] For a definition of the word "integration" used therein see op. cit. sec. 228.

terms of art associated with negotiated contracts were used by the parties. Petitioner, on the other hand, points to certain of the same documents referred to by respondent where the parties used the words "invitation" and "bid," words foreign to the concept of negotiated procurement. Words, of course, cannot alter the actual facts, and it goes without saying that the facts are not to be subordinated to labels. Based upon the evidence stipulated by the parties which we have set forth in considerable detail, we believe that all of the essential requirements for formal advertising stated in section 3 of the Armed Services Procurement Act of 1947, as in effect in 1955, were complied with by the district engineer in awarding Contract 137, and furthermore, that the district engineer clearly intended to comply with all of the requirements of formal advertising at least until the proposals were finally opened and announced.

Respondent also argues that the award of Contract 137 was not a result of formal advertisement procedures because if it were, the petitioner would have been entitled to the award, unless no award had been made at all by the district engineer with all bids rejected, without having to attend the conferences held on November 17 and 18, 1955. Relying on the language of the "Invitation For Fixed Price Proposals" which states "In the event that no intention to award is indicated on opening of proposals, negotiations will be initiated with the firm or firms submitting the lowest responsive price proposals," respondent contends that since no intention to award the contract was indicated by the district engineer when the proposals were opened on November 15, 1955, the conferences held a few days later were, in reality, "negotiations."

We find no merit in respondent's contention. However the conferences on November 17 and 18 are to be described, Contract 137 was not awarded as a result of these conferences but was awarded as a result of the competitive bidding between GC–DAC and its competitors. The proposal which was later accepted by the district engineer was in all essential matters exactly the same as that submitted on November 15 by GC–DAC in accordance with all the requirements of a formally advertised, competitively bid contract. The only contract term altered in these conferences was the location of GC–DAC's stateside office in Trenton rather than in New York—a matter of negligible consequence to petitioner, and of no consequence to district engineer since it did not affect the efficiency of petitioner's operation and did not increase the Government's costs under the contract. The minutes of the conferences held on November 17 and 18, stipulated into evidence by the parties, reveal discussions largely confined to clarifying the terms of the district engineer's "invitation" and GC–DAC's "proposal."

We are satisfied from a consideration of the stipulated facts that the specifications and invitation permitted such full and free competition

as was consistent with the type of work required by the Department of the Army; that the invitation contained in its specifications sufficient detailed information to permit prospective bidders to bid; that the invitation permitted prospective bidders sufficient time to prepare and submit their bids or proposals; that the bids or proposals were publicly opened at the time and place stated in the invitation; and that the award of the contract was made with reasonable promptness by written notice to the responsible bidder whose bid or proposal conformed to the invitation and was most advantageous to the Government. We therefore conclude that the proceedings leading up to the awarding of Contract 137 were in substantial conformity with the requirements for procurement by formal advertising as set forth in the provisions of section 3 of the Armed Services Procurement Act of 1947 which we have already quoted.

Specifically, we conclude that GC–DAC's low proposal was accepted by the district engineer with reasonable promptness after the opening of proposals, that Contract 137 was awarded on the basis of the offer contained in GC–DAC's proposal, and that GC–DAC's prime Contract 137 is exempt from renegotiation because that contract was awarded "as a result of competitive bidding" within the meaning of section 106(a)(9) of the Renegotiation Act of 1951. Accordingly, Greenland Contractors' subcontract under Contract 137 is also exempt from renegotiation by reason of section 106(a)(7) of that Act.

### Issue 2. Contract 290

Contract 290 required construction of two radar sites on the Greenland Ice Cap referred to in the contract as "Dye-2" and "Dye-3." Each of these sites consisted of a large, main, composite steel building to house all electronic equipment; a powerplant and living quarters; a disaster building to shelter the crew in case of an emergency; underground tanks for fuel oil storage; connecting tunnels to the main building; water supply and sewage disposal installations.

Contract 290 was awarded to Peter Kiewit Sons' Co. on February 19, 1959, in the amount of $12,720,000. The work under Contract 290 was performed by a subcontractor of Peter Kiewit Sons' Co., comprised of a joint venture of Peter Kiewit Sons' Co. and Al Johnson Construction Co. (the 290 Contractor). The parties have stipulated that Contract 290 was awarded as a result of competitive bidding and hence that Contract 290, as originally awarded on February 19, 1959, is exempt from renegotiation under section 106(a)(9) of the Renegotiation Act of 1951, as amended.

Clause 3, entitled "Changes," of Contract 290 provides:

The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its

performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim of the Contractor for adjustment under this clause must be asserted in writing within 30 days from the date of receipt by the Contractor of the notification of change: *Provided, however,* That the Contracting Officer, if he determines that the facts justify such action, may receive and consider, and adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Clause 6 thereof. But nothing provided in this clause shall excuse the Contractor from proceeding with the prosecution of the work as changed. Except as otherwise herein provided, no charge for any extra work or material will be allowed.

Clause 6 of Contract 290, referred to above provides as follows:

Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the head of the department, and the decision of the head of the department or his duly authorized representatives for the hearings of such appeals shall, unless determined by a court of competent jurisdiction to have been fraudulent, arbitrary, capricious, or so grossly erroneous as necessarily to imply bad faith, be final and conclusive: *Provided,* That, if no such appeal to the head of the department is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision.

The $9,937,000 of receipts and accruals involved in the Contract 290 issue was received or accrued by the 290 Contractor as subcontractor for work performed by it under change orders and supplemental agreements to Contract 290 which increased the contract price by $9,937,000. Thirty-six of these changes, totaling $8,726,803, were made by change orders issued in accordance with the "Changes" article of Contract 290. The remaining two changes, totaling $1,210,197, were made by supplemental agreements and "related to work to be performed at or adjacent to the original projects." [6] Each of these bore the title "Modification [No. 1 through No. 39] [Supplemental Agreement or Change Order] to Contract No. DA–30–347–ENG–290" (Modification No. 4— a change order—was never issued).

Of the two supplemental agreements, recited as having been authorized by and negotiated pursuant to 10 U.S.C. sec. 2304(a)(6), one, executed "as of the 31st day of May, 1960," related to the "Construction of Vehicle Shelters and Miscellaneous Changes at Dye–2 and Dye–3" and increased "the total contract amount" by $620,297; and the other,

[6] This quoted language is from a stipulation made by the parties.

executed "as of the 30th day of June, 1960," related to "Emplacement Tasks at Dye–2 and Dye–3" and increased "the total contract amount" by $589,900.

Of the 36 change orders relating to the same construction work covered by the same Contract 290, a number increased "the total contract amount" by over $100,000 each. One of the change orders consisted of 35 paragraphs set out in 25 pages modifying 8 "contract bid items" and increased "the total contract amount" by $5,736,703.

The change orders were dated as follows: 31 March, 1959; 20 May, 1959; 3 June, 1959; 31 July, 1959; 2 December, 1959; 8 February, 1960; 1 March, 1960, 10 March, 1960; 28 March, 1960; 6 May, 1960; 10 June, 1960; 29 July, 1960; 25 August, 1960; 22 September, 1960; 6 October, 1960; 7 October, 1960; 10 October, 1960; 10 October, 1960; 22 October, 1960; 17 October, 1960; 19 October, 1960; 4 November, 1960; 14 November, 1960; 6 December, 1960; 14 December, 1960; 16 January, 1961; 7 February, 1961; 8 February, 1961; 7 March, 1961; 8 February, 1961; 6 May, 1961; 7 July, 1961; 27 September, 1961; 25 October, 1961; 5 January, 1962; and 12 January, 1962. Each bore a notation signed by petitioner which indicated that the modification of the contract (290) was satisfactory to the 290 Contractor. The change orders and the supplemental agreements increased the amount paid to the 290 Contractor by more than 78 percent of the original contract price.

In the instant consolidated renegotiation proceedings, respondent determined that the 290 Contractor had realized excessive profits of $3 million ($2,996,300 after adjustment for income taxes other than Federal taxes) with respect to the $9,937,000 increase in the contract price resulting from the change orders and supplemental agreements.

Briefly stated, the matter at issue regarding Contract 290 is whether any part of the increases in the contract price in aggregate amounts in excess of 78 percent thereof resulting from the change orders and supplemental agreements above referred to was subject to renegotiation as provided by regulations issued by respondent.

In its "Statement of Facts and Reasons" accompanying its "Order Determining Excessive Profits" dated May 19, 1966, respondent made no statement indicating the authority relied upon in determining that the increases in the Contract 290 price were subject to renegotiation. However, in its original brief filed in this proceeding, the respondent states that it was authorized to make its original determination by RBR section 1453.7(d), 32 C.F.R. sec. 1453.7(d) (1969 supp.), as promulgated on February 20, 1965, 30 Fed. Reg. 2313 (1965), and as in effect when the Order Determining Excessive Profits was issued. That regulation provides:

(d) *Price increases.* If a prime contract which is exempt under the provisions of section 106(a)(9) of the act is supplemented or otherwise modified to increase the price stated therein, but the aggregate of the price increases provided in all such supplemental or other modifying instruments does not exceed one-third of the price stated in the original contract, then all such supplemental or other modifying instruments are likewise exempt. If such aggregate does exceed one-third of the original contract price, the supplemental or other modifying instruments are not exempt, and the entire amount of the price increases provided therein is subject to renegotiation.

On the other hand, petitioner assumed in its original brief that the regulation relied on by respondent was RBR section 1453.7(d), 32 C.F.R. sec. 1453.7(d) (1961 supp.), as promulgated on August 23, 1955, 20 Fed. Reg. 6120 (1955), and as in effect during the years the work under Contract 290 was awarded and completed. That regulation provides:

(d) *Additional construction.* When a construction contract is supplemented or otherwise modified to provide for additional or different construction of installation of buildings, structures, improvements or similar facilities, to be performed at or adjacent to the site of the original project, such supplemental or other modifying instruments are considered a part of the original construction contract. Therefore, if a prime contract is exempt from renegotiation under the provisions of section 106(a)(9) of the act, all such supplemental or other modifying instruments are likewise exempt from renegotiation, but only if the aggregate of the prices stated in all such supplemental or other modifying instruments does not exceed one-third of the price stated in the original construction contract. If such aggregate does exceed one-third of the original price, the supplemental or other modifying instruments are not exempt, and the entire aggregate, including such one-third, is subject to renegotiation.

In its reply brief, petitioner has vigorously questioned the validity of respondent's reliance in its original brief on RBR section 1453.7(d), as promulgated in 1965. Respondent, in its reply brief, defends its reliance on RBR section 1453.7(d), as promulgated in 1965, but contends in the alternative that there is no material difference between that regulation and its predecessor with respect to the change orders and supplemental agreements added to Contract 290. For the reasons stated hereafter we agree with respondent's alternative contention. Therefore we shall assume *arguendo* that the 1955 version of the regulation is to be applied herein and restrict the focus of our discussion hereafter to RBR section 1453.7(d), as promulgated in 1955.

In its original brief petitioner makes a lengthy argument, which it seeks to support by citations to numerous authorities, to the effect that change orders issued pursuant to the "Changes" clause of a procurement contract, such as Contract 290, were within the original contemplation of the contracting parties and are legally to be considered as a part of the original contract. Petitioner then points out that RBR section 1453.7(d), as promulgated in 1955, states, as a threshold requirement for its application, that work contracted under "sup-

plemental or other modifying instruments" must be "additional or different construction * * * at or adjacent to the site of the original project." Petitioner notes further that this threshold requirement was abandoned in RBR section 1453.7(d), as amended in 1965, in favor of a standard consisting only of the amount of price increases. Relying also on the portion of RBR section 1453.7(d), as promulgated in 1955, which states that "supplemental or other modifying instruments are considered as a part of the original construction contract," petitioner argues that, since change orders are for many purposes considered to be, in law and in administrative practices, parts of the initial contract without the necessity of any specified directive that they be "considered" such, the statement that "such supplemental or modifying instruments are considered a part of the original construction contract" in RBR section 1453.7(d), as promulgated in 1955, must refer only to modifying instruments which "provide for additional or different construction" and thus in effect constitute new procurement which is necessarily added by supplemental agreement or other similar amendment to the original contract and not by change orders issued pursuant to the "Changes" article.

Although RBR section 1453.7(d), as drafted and promulgated in 1955, can hardly be said to be free from ambiguity, it seems clear that it was intended to apply to "all modifying instruments" of an exempt contract. It also seems clear to us that change orders issued pursuant to the "Changes" article are, generally speaking, "modifying instruments" to a contract and petitioner makes no argument to the contrary. Since they modify contracts calling for "the construction or installation of buildings, structures, improvements or similar facilities," they may quite reasonably be construed as providing for "additional or different construction or installation." The parties have stipulated that the two supplemental agreements "related to work to be performed at or adjacent to the original projects." While they have entered into no such stipulation with regard to the work performed under the change orders, it seems clear to us from a careful inspection of the change orders and the schedules of the work to be performed as set out therein and a comparison of this work with that scheduled for performance in supplemental agreements, that the work scheduled in the change orders, like the work scheduled in the supplemental agreements, was "to be performed at or adjacent to the original contract."

Accordingly, we conclude that there is no material difference between the two forms of RBR section 1453.7(d) as applied to the facts of this case and that both of them were intended to apply and do apply to the change orders here involved.

Section 106 (a) (9), quoted above, which exempted from renegotiation construction contracts awarded pursuant to bids was enacted as a part of the Act of August 3, 1955 (ch. 499, 69 Stat. 447), which extended the effectiveness of the Renegotiation Act of 1951 beyond the date set for its termination, and was intended to be and was an amendment of the Renegotiation Act thus extended. The statute makes no definite and unambiguous provision with regard to the question whether the provisions of this section were intended to exempt from renegotiation profits resulting from changes in the construction work to which the contract related, regardless of the size of the contract amounts involved in such changes, which were made by the parties to the contract after the contract was executed and without advertising for or receiving bids relating to such changes. However Renegotiation Board Regulation section 1453.7(d), drafted and promulgated contemporaneously with the Act of August 3, 1955,[7] quoted above, provides that "if the aggregate of the prices stated in all such supplemental or other modifying instruments does * * * exceed one-third of the original price, the supplemental or other modifying instruments are not exempt, and the entire aggregate, including such one-third, is subject to renegotiation."

Each of the Acts of August 1, 1956 (70 Stat. 786), of September 6, 1958 (72 Stat. 1789), of July 13, 1959 (73 Stat. 210), of July 3, 1962 (76 Stat. 134), and of June 30, 1964 (78 Stat. 233), extended the effectiveness of the Renegotiation Act of 1951 as amended.

On February 20, 1965, a new section 1453.7(d) of the Renegotiation Board Regulations was promulgated (30 Fed. Reg. 2313 (1965)) which, in wording, differed somewhat from the section 1453.7(d), RBR, quoted above which, as we have already pointed out, also provides that if "the aggregate of the price increases provided in all such supplemental or other modifying instruments does * * * exceed one-third of the original contract price, the supplemental or other modifying instruments are not exempt, and the entire amount of the price increases provided therein is subject to renegotiation."

After February 20, 1965, the Renegotiation Act of 1951 as amended was extended by the Acts of June 30, 1966 (80 Stat. 232), and of October 24, 1968 (82 Stat. 1345).

While some few amendments were made to the Renegotiation Act of 1951 by the various Acts subsequent to 1955 which extended its effectiveness, no change was made in section 106(a)(9) by any of these Acts.

Thus we have an administrative construction of section 106(a)(9) of the Renegotiation Act made and promulgated contemporaneously with the enactment of that section which has, in all material respects,

---

[7] The regulation was dated Aug. 17, 1955, was filed Aug. 22, 1955, and was promulgated Aug. 23, 1955, in 20 Fed. Reg. 6121.

been consistently applied by the Renegotiation Board since its promulgation, during which time the Act as amended by the addition of section 106(a)(9) has been extended and in effect reenacted by seven Acts of Congress over a period of 13 years without any change by Congress of section 106(a)(9) or any other indication by Congress that it considers the administrative construction of the section to be erroneous or contrary to the intent of Congress.

While the statement made in *Helvering* v. *Reynolds Co.*, 306 U.S. 110, 116 (1939), to the effect that "the legislative approval of existing regulations by reenactment of the statutory provision to which they appertain gives such regulations the force of law" has been limited and qualified by the gloss of subsequent cases (see *Helvering* v. *Wilshire Oil Co.*, 308 U.S. 90 (1939) ; but cf. *Crane* v. *Commissioner*, 331 U.S. 1, 7–8 (1947)), it is still an approved technique of statutory construction to consider such reenactments in giving weight to the validity of the interpretation placed upon the statute by the regulation. See *Corn Products Co.* v. *Commissioner*, 350 U.S. 46 (1955). As we said in *Estate of John H. Boogher*, 22 T.C. 1167, 1172 (1954), "we must give substantial weight to such interpretation in the light of the apparent approval thereof to be implied from the fact that Congress found no reason to alter or correct such interpretation." See *F.H.A.* v. *The Darlington, Inc.*, 358 U.S. 84, 90 (1958). And the use of congressional reenactment limited to a technique of statutory construction has been tolerated by even the most formidable commentators speaking out against the literal validity of the quoted statement from the *Reynolds* case, e.g., Paul, "Use and Abuse of Tax Regulations," 49 Yale L. J. 684 (1940).

Another, and a more important factor in ascribing the weight to be given to an administrative regulation in an interpretation of a statute is the circumstance that the promulgation of the regulation was contemporaneous with the enactment of the statutory provision to which it appertains. In *Augustus* v. *Commissioner*, 118 F. 2d 38, 43 (C.A. 6, 1941), the court said, following a quotation from *Edwards* v. *Darby*, 12 Wheat 206, 25 U.S. 206, 210 (1827) : [8]

The first administrative interpretation of a provision as it appears in a new act often expresses the general understanding of the times or the actual understanding of those who played an important part when the statute was drafted.

In a commentary written by a leading critic of the *Reynolds* case the view is expressed that even through reenactment of the statute in and of itself should not be considered as a factor in the application of administrative regulations, the "contemporaneousness" of the regulation

---

[8] "In the construction of a doubtful and ambiguous law, the contemporaneous construction of those who were called upon to act under the law, and were appointed to carry its provisions into effect, is entitled to very great respect."

with the statute construed by it is and should be an important factor in the application of the regulation since "Regulations issued substantially contemporaneously with a statute are the expression of what the statute was understood to mean by those immediately charged with carrying it into effect." Griswold, "A Summary of the Regulations Problem," 54 Harv. L. Rev. 405 (1941). See also *F.H.A.* v. *The Darlington, Inc., supra* at 91. A comparatively recent statement of this principle is found in *Udall* v. *Tallman*, 380 U.S. 1, 16 (1965), where the Supreme Court said:

When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. "To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." *Unemployment Comm'n* v. *Aragon*, 329 U.S. 143, 153. See also, e.g., *Gray* v. *Powell*, 314 U.S. 402; *Universal Battery Co.* v. *United States*, 281 U.S. 580, 583. "Particularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.' "

In the instant case we have a regulation promulgated by the Renegotiation Board only a few days after the enactment of a statute amending the Renegotiation Act, and the substance of this regulation insofar as it is pertinent to this case has remained unchanged by 7 Acts of Congress passed after the promulgation of the regulation which have extended the effectiveness of the Renegotiation Act as amended by the statute construed by the regulation.

In addition to the reenactment of the statute and the contemporaneousness of the regulation, the extended length of time during which the regulation has been in effect and has been consistently applied by the administrative agency is a factor to be considered in determining a question which concerns the validity of a regulation. Regulations which "have been in effect for more than 15 years," which are reasonable and which are not "plainly and palpably inconsistent with the law," "should not be overruled except for weighty reasons." *Albermarle Paper Mfg. Co.* v. *Renegotiation Board*, 35 T.C. 438, 443.

Giving appropriate weight to these factors we are of the opinion that the regulation here involved is valid insofar as it provides that when modifying instruments, such as change orders, relating to a construction contract exempt from renegotiation under section 106(a)(9) exceed in their aggregate one-third of the original price of the contract, such aggregate of the prices of the modifying instruments is subject to renegotiation.

With regard to the change orders petitioner argues to the contrary with earnestness and apparent sincerity. It points out a number

of circumstances and situations in which change orders are considered or referred to as in effect modified parts of the original contract (e.g., a paragraph of the Army Procurement Procedure Regulations, 32 C.F.R. sec. 590.252 (1954 ed.), referring to change orders and supplemental agreements as "types of contract modificaton"). It urges a conclusion that since the ordinary understanding of the word "contract" as shown by the example given would include therein modifications effected by change orders, this ordinary understanding should be adhered to in a construction of the statute and regulations and in a consideration of the question of the regulations' validity in the absence of "strong countervailing considerations," citing *Crane* v. *Commissioner*, 331 U.S. 1, 7.

In our opinion the "strong countervailing considerations" which undermine the validity of this argument of petitioner consist of negotiated procurements in the aggregate amount of $8,726,803 being inserted by change orders in a contract which as competitively bid called for the payment of $12,720,000. Where such circumstances exist we are unable to conclude that the modifications effected in the contract to the extent of such a substantial proportion of the contract price without the safeguards of competitive bidding must be considered, regardless of the realities, as being so inseparable from the original competitively bid contract that they cannot be treated by regulations having all of the sanctions described by us in our discussion *supra* as what they in reality are, to wit, negotiated procurements, and as such subject to the renegotiation statutes, in spite of their technical interpolation into a competitively bid contract.

Petitioner's contention that the regulations thus construed and applied are unnecessary for the protection of the Government in view of the provisions of clauses 3 and 6 of Contract 290 and thus are unreasonable and invalid is not convincing. Even assuming that clauses 3 and 6 afford the Government a safeguard of sorts against the realization of excessive profits from the contract work called for by the change orders, there is no resulting demonstration that a more effective safeguard is not afforded by the provisions of the Renegotiation Act of 1951 as construed by respondent's regulations. Certainly the availability to the Government of one method of protecting itself from the payment of excessive profits on certain contracts should not ipso facto and without specific statutory limitation preclude the use by the Government of another method otherwise available which it considers equally or more effective. See *Gray* v. *Powell*, 314 U.S. 402 (1941).

In this connection we point out the number and frequency of the change orders here involved, the fact that they related to defense installations which, in the absence of evidence to the contrary, we

may speculate were of some importance to our national interests and concerning which there was some urgency, the fact that they amounted to many millions of dollars and concerned varied and complicated construction problems, and the fact that all of them bore the notations signed by petitioner to the effect that they were accepted by it. Nothing in the record negates a minimal amount of negotiation with regard to each change order and nothing in the record suggests that petitioner even contemplated asserting a claim for adjustment in writing within 30 days or taking any step questioning the amounts of the adjustments in price made by any of the 36 change orders. From the fact that these 36 change orders, which in the aggregate increased the contract price by $8,726,803, were executed within less than 2 years, all to the uniform satisfaction of the contractor, it may be inferred that the contracting officers executing the change orders were concentrating their attention on obtaining proper and prompt construction of installations on the assumption that any question of excessive profiits could be determined in renegotiation proceedings which would consider the aggregate of the change orders as of the completion of Contract 290 and at a time when a thorough examination could be made by the Renegotiation Board into the matters involved. On the record before us we are unable to agree with petitioner's contention "that the 'changes' article gives the Government just as much protection against that risk [of excessive profits] as renegotiation." Even if we were to assume that the protection afforded by clauses 3 and 6 is the equivalent of the protection afforded by renegotiation we are not persuaded that change orders in the aggregate amount of $8,726,803 (a little over two-thirds of the "contract price") made without competitive bidding and after at least the amount of negotiation which persuaded petitioner to formally note its acceptance of the change orders and their terms and refrain from any action authorized by clauses 3 and 6, were not in reality negotiated procurements with regard to which it was advisable, as a practical matter, for the Government to have the additional protection of renegotiation. Again we state our conclusion that petitioner has failed to show that the respondent's regulations do not constitute a reasonable and proper construction of the statute.

Congress has given to respondent the responsibility to interpret the Renegotiation Act of 1951 in light of the conditions to which that Act is to be applied in order to carry out the Act's purposes. *Litcher* v. *United States*, 334 U.S. 742, 785. Petitioner has not clearly demonstrated that respondent has abused its discretion in interpreting the Act in the manner set forth in RBR section 1453.7(d), either as promulgated in 1955 or as amended in 1965. We therefore hold that the aggregate of the $9,937,000 increases in the original Contract 290 price for work performed under both the change orders and the

supplemental agreements modifying that contract is subject to renegotiation.

In accordance with the stipulation of the parties, it follows that petitioner realized excessive profits in the amount of $4,250,000 for its fiscal year ended December 31, 1961, which amount shall be subject to applicable credits for State and Federal taxes in accordance with the provisions of the Renegotiation Act of 1951, as amended.

*Decision will be entered under Rule 50.*