**AMCO ELECTRIC, a California corporation,**

v.

**The UNITED STATES.**

**No. 578–71.**

United States Court of Claims.

March 20, 1974.

Charles E. Millikan, Jr., Pasadena, Cal., attorney of record for plaintiff.

Gerald D. Freed, Washington, D. C., with whom was Acting Asst. Atty. Gen., Irving Jaffe, for defendant, William E. Nelson, C. Max Vassanelli, and Bruce G. Forrest, Washington, D. C., of counsel.

Before DAVIS, SKELTON, and NICHOLS, Judges.

NICHOLS, Judge:

This case is here for our redetermination of the Renegotiation Board's determination that the plaintiff received $300,000 in excessive profits for the fiscal year ending April 30, 1964. AMCO Electric Corp. (AMCO) filed the petition initiating this action in the Tax Court on September 22, 1969. The case was transferred to this court pursuant to Pub.L. 92–41 § 3, 85 Stat. 97, 98 (1971), amending the Renegotiation Act of 1951, 50 U.S.C. App. §§ 1191, 1211 et seq. (1970), which transferred jurisdiction of Renegotiation cases from the Tax Court to the Court of Claims.

The only issue raised by the parties' cross motions for summary judgment is whether Contract No. DA–04–548–ENG–18 was awarded as a result of competitive bidding. If it was, receipts from the contract and receipts from the subcontracts under the contract are exempted from renegotiation. 50 U.S.C. App. § 1216(a)(7) and (a)(9). Because the renegotiable receipts and accruals of the plaintiff exceed the 50 U.S.C. App. § 1215(f) statutory minimum only when receipts and accruals from plaintiff's subcontract under Contract No. DA–04–548–ENG–18 are included as renegotiable receipts and accruals, plaintiff is subject to renegotiation for fiscal year 1964 only if that contract was not awarded as a result of competitive bidding. The relevant facts are as follows:

In the Fall of 1960 the Army Corps of Engineers was working on the first deployment of the Minuteman missile. An essential component of such project was the construction of 150 Minuteman missile silos in a widely dispersed area surrounding Malmstrom Air Force Base in Great Falls, Montana. The contract for the construction of the missile silos was awarded before the first Minuteman missile was test fired. This concurrence in deployment was essential in order to satisfy national defense objectives.

The Army Corps of Engineers issued a *Notice to Interested Parties* dated September 2, 1960. This document stated that because of the "national urgency" of the Minuteman project "the normal procedures applicable to publicly advertised contracts will not be followed." In view of these objectives an accompanying memorandum noted "invitations to bid will be issued only to those construction firms with a record of performance which makes timely and efficient construction certain." A contractor was required to prequalify before receiving an invitation to bid.

On November 4, 1960, invitations to bid were sent to the contractors who prequalified. Only four bids were received.

The bids were publicly opened on December 13, 1960. Although the Corps' original estimate was $50,000,000, the lowest bid was $78,907,000. All bids were rejected since the low bid exceeded the cost estimate by too great a margin.

The Corps then decided to modify the specifications with the goal of easing the financial risks facing the contractors so as to render the project attractive at a lower cost. With this goal in mind the Corps notified the prequalified contractors that it intended to issue a request for proposals from them which were to serve as a basis for negotiation.

On January 13, 1961, the contracting officer, Colonel C. C. Noble, issued the following findings as justification for a departure from competitive bidding:

\*   \*   \*   \*   \*   \*

1. The proposed construction is of such type (first Minuteman program), scope and magnitude as to deter bidders from submitting a firm, fixed price therefor, except with inclusion of substantial amounts for contingencies which may not occur. Procurement by method of negotiation will

permit identification of any contingency amounts included in proposals submitted by contractors, and adoption of a contract type whereby the Government will be in a position to examine actual costs experienced by the successful contractor, and to pay no more than actual, allowable costs experienced, plus a fair profit.

2. Negotiation procedure will permit the Government to further modify the specifications during the negotiations, if determined necessary or advantageous to the Government.

3. The price, rate, or charge for the contemplated procurement is not fixed by law or regulation.

In view of the findings and determinations above set forth, I have concluded that it is impracticable to secure competition by method of formal advertisement for firm, fixed-price bids, to an extent which will result in a price which the Government is willing to pay; and that it is, therefore, in the best interest of the Government to secure a contract through negotiation.

&ast; &ast; &ast; &ast; &ast; &ast;

On January 14, 1961, Colonel Noble requested the Chief of the Army Corps of Engineers to authorize procurement by negotiation pursuant to the above stated findings. He received formal authority to so proceed on January 23, 1961.

In implementing the change to negotiation as the method of procurement the Corps issued an addendum changing the references to "bids" and "bidders" in the proposed contract to "proposals" and "offerors". On January 20, 1961, the Corps issued a *Request for Proposal* to each prequalified contractor. Such request, along with a supplemental notice on the Montana Minuteman project dated January 24, 1961, informed the contractors that the Corps was switching from a fixed price competitively bid contract to a "fixed price incentive type contract." "Proposals" (as opposed to "bids") were to be "based on proposed target prices."

A fixed price incentive contract was apparently chosen in this instance to reconcile the competing objectives of: 1) transferring some of the contractor risks to the Government in hopes of reducing the contract cost, and 2) still providing the contractor with some incentive for efficient performance. The contract sets a target cost and a target profit which when combined equal the target price. If actual costs are less than the target costs the contractor receives an agreed percentage of the savings. However, if actual costs are more than target costs a percentage of the cost overrun is deducted from the contractor profit. Finally, there is a ceiling price above which the contractor must absorb all costs.

The January 24th notice contained a "Proposed Clause for Fixed Price Incentive Type Contract". Into this form the variables described above were tentatively inserted and the contractors were asked to each submit a proposed total contract price. Six proposals were submitted. Upon review of these proposals on February 7, 1961, it was concluded that only three were of such amount that further discussions could be expected to be fruitful.

Negotiations took place on February 8–14, 1961, resulting in changes in *all* of the variables in the incentive provision. These were not insubstantial as plaintiff contends. The increase in the target profit alone from 5% to 6.5% was no small matter in a contract of this size.

On February 14, 1961, the six contractors who responded to the earlier *Request for Proposals* were asked to submit new proposals on the contract as modified above.

On February 17, 1961, the Corps opened the six proposals received. The proposals were not publicly opened. The contract was awarded to George A. Fuller Co.—Del E. Webb Corp., (hereinafter Fuller-Webb), a joint venture, on February 28, 1961.

At the upper right hand corner of the front page of such contract is the word "NEGOTIATED". On the center of the page is inserted, "This contract is authorized by 10 U.S.C. 2304(a)(10) (Public Law 1028, 84th Congress, approved 10 August 1956)." At page 15, the contract provided as follows:

\*    \*    \*    \*    \*    \*

40.  RENEGOTIATION

(a) To the extent required by law, this contract is subject to the Renegotiation Act of 1951 (50 U.S.C.App. 1211, et seq.), as amended, and to any subsequent act of Congress providing for the renegotiation of contracts. Nothing contained in this clause shall impose any renegotiation obligation with respect to this contract or any subcontract hereunder which is not imposed by an Act of Congress heretofore or hereafter enacted. Subject to the foregoing this contract shall be deemed to contain all the provisions required by section 104 of the Renegotiation Act of 1951, and by any such other act, without subsequent contract amendment specifically incorporating such provisions.

(b) The Contractor agrees to insert the provisions of this clause, including this paragraph (b), in all subcontracts, as that term is defined in section 103g of the Renegotiation Act of 1951, as amended.

Fuller-Webb awarded AMCO a fixed price subcontract for the electrical portions of the work.

The Congress added to the statute the 50 U.S.C. App. § 1216(a)(9) mandatory exemption from renegotiation for "any contract, awarded as a result of competitive bidding, for the construction of any building, structure, improvement, or facility \* \* \*", in a 1955 amendment. Public Law 216, 84th Cong., 1st Sess., 69 Stat. 448. The Senate Report and the identical language in the Conference Report indicate what Congress intended by the term "competitive bidding". S. Rept.No.582, 84th Cong., 1st Sess., U.S.

Code Cong. & Admin.News 1955, p. 2614, 2616 states:

\*    \*    \*    \*    \*    \*

Section 3 of the bill, as amended by your committee, provides for a mandatory exemption of competitive-bid construction contracts. A similar exemption was contained in subsection (i)(1)(E) of the Renegotiation Act of 1943. As under the Renegotiation Act of 1943, *the exemption is to be limited to contracts awarded in conformity with the requirements for procurement by formal advertising now set forth in the Armed Services Procurement Act of 1947. \* \* \** (Emphasis supplied.)

Consistent with the legislative history, the Renegotiation Board issued regulations setting forth the scope and applicability of the exemption. Renegotiation Board Regulation § 1453.7, 32 C.F.R. § 1453.7. These regulations cite the legislative history almost verbatim.

■  AMCO's subcontract is subject to renegotiation only if the prime contract under which it was awarded is subject to renegotiation. AMCO contends that the Fuller-Webb prime contract is mandatorily exempt from renegotiation under 50 U.S.C. App. §§ 1216(a)(7) and (a)(9) since it was awarded as a result of competitive bidding. We find this argument without factual or legal foundation.

■  The contract awarded was a fixed price incentive contract. This type of contract can only be awarded as a result of negotiation since ASPR § 2-104.1, 32 C.F.R. § 2.104-1, limits contracts awarded by formal advertising to the firm fixed price type with a minor exception irrelevant to the present controversy. The contracting officer had no authority to bind the Government to a fixed price incentive type contract except by negotiation since the procurement regulations have the force and effect of law. Winston Bros. Co. v. United States, 458 F.2d 49, 198 Ct.Cl. 37 (1972).

Plaintiff's failure to note the distinction between a firm fixed price and a fixed price incentive contract leads to its reliance on the proposition that a contract is awarded through formal advertising, if all of the things that must be done in awarding contracts by formal advertising as prescribed in the Armed Services Procurement Act of 1947, 10 U.S.C. § 2305 are done. Plaintiff fails in proving that such requirements were met in this case. The principle which is dispositive of this case is correctly stated in Renegotiation Ruling No. 7, 32 C. F.R. § 1499.1–7(e):

\* \* \* \* \* \*

(e) Generally, in considering whether a contract was let in conformity with the requirements for formal advertising, if the contract states that it was negotiated pursuant to one of the exceptions set forth in 10 U.S.C. 2304(a), the Board will accept and adhere to that determination for purposes of renegotiation; likewise, if the contract states or otherwise indicates that it was awarded pursuant to formal advertising in accordance with 10 U.S.C. 2304(a), the Board will accept and adhere to that determination for purposes of renegotiation.

\* \* \* \* \* \*

On the very top of the first page of the contract is the word "NEGOTIATED". Under the heading of "ADMINISTRATIVE DATA (Optional)" in the middle of the first page is the following language:

This contract is authorized by 10 U. S.C. 2304(a)(10) (Public Law 1028, 84th Congress, approved 10 August 1956).

■ 10 U.S.C. § 2304(a)(10) permits negotiation when a "contract is for property or services for which it is impracticable to obtain competition". In the absence of a showing of arbitrariness, inadvertence, or falsification on the part of the contracting officer we will not upset his determination as to how a contract was awarded as expressed in that document. It is clear that the procurement authorities have a legal choice of tracks to take in awarding contracts, by formal advertising or by negotiation. Congress intended the choice of tracks to be determinative of the exemption, not what the procurement officer actually did to obtain competition, nor the degree of his success in obtaining it.

Plaintiff relies heavily on Greenland Contractors v. Renegotiation Board, 54 T.C. 177 (1970), in which the Tax Court determined that a firm fixed price contract was awarded pursuant to formal advertising, despite the fact that its introductory paragraph stated (p. 185):

This contract is authorized and negotiated pursuant to the provisions of Title II of the First War Powers Act, 1941, as amended, and the Executive Order 10210 dated 2 February 1951, as amended; Section 2(c)(1) of the Armed Service Procurement Act, Public Law 413, 80th Congress and Presidential Proclamation 2914.

*Greenland Contractors* is factually distinguishable since it involved the award of a firm fixed price contract as opposed to the fixed price incentive contract which is our present concern. As previously discussed, a firm fixed price contract can be awarded through formal advertising, while a fixed price incentive contract can only be awarded as a result of negotiations. Also, the bids in the present case were not publicly opened as required in the case of formally advertised contracts by the Armed Services Procurement Act of 1947 and the regulations thereunder. 10 U.S.C. § 2305(d); ASPR § 2–101(d), 32 C.F.R. § 2.101(d). The Tax Court in *Greenland Contractors*, states there was a public opening.

We consider the *Greenland Contractors* case, moreover, to be predicated upon a general approach to the problem which we do not take. While we respect the determinations of the Tax Court, we are not bound to follow them by the doctrine of legislative reenactment. Lykes

**652**

Bros. S. S. Co. v. United States, 459 F. 2d 1393, 198 Ct.Cl. 312 (1972). In *Greenland Contractors,* apart from the way the procurement officers labelled the contract, the fact they reserved the right to negotiate with bidders after bid opening, shows they had elected the negotiation track, and the fact that in the event they awarded the contract without such negotiation was legally irrelevant. We would respect the judgment of the procurement officers that the contract was negotiated unless their statements were shown to be inadvertent error, wilfully false, or wholly arbitrary. Failure to respect the statement in the contract, that it was negotiated, and substitution of a factual inquest into the degree of competition obtained, tends to prevent subcontractors of the first and more particularly of lower tiers, from being able to ascertain whether their subcontracts are renegotiable or not. While it is legally and factually possible for a party to a subcontract to be unaware that it is renegotiable and thus to become subject to renegotiation involuntarily (*Cf.* Sandnes' Sons v. United States, 462 F.2d 1388, 199 Ct.Cl. 107 (1972)), surely it is inadvisable to multiply such instances without need. The Congress was aware of this, and this is plainly the reason for its emphasis on the readily ascertainable formality of advertised procurement, not the substance of competition among bidders, as it might be established after discovery in the course of litigation. The statement in the contract of how it was awarded, whether by formal advertising or negotiation, is not a mere gratuitous pronouncement. It is important to show that the ASPR have all been complied with, to sustain the validity of the award against attack by unsuccessful bidders. It is important to show whether the Truth in Negotiations Act, 10 U.S.C. § 2306(f) is applicable to the contract. Doubtless it is important in many other contexts, besides the one here involved. It must be presumed that procurement officials have acted properly in classifying the contract, and have given effect to their best understanding of what track they did in fact employ. It is not a matter, as plaintiff argued before us, of the Board in Renegotiation Ruling No. 7 delegating to contracting officers the power to control whether contracts are renegotiable or not, by slapping on labels at their own whim and pleasure.

 It may be added that the Congress in the Truth in Negotiations Act, *supra,* exempts negotiated contracts from that Act "where the price negotiated is based on adequate price competition", thereby evidencing its awareness that the elements of genuine competition may be found in a negotiated award, as well as in one that was formally advertised. If, as plaintiff urges, we applied the exemption whenever competition was in fact obtained, we would be applying it far more broadly than the Congress intended.

Plaintiff's motion for summary judgment is denied. Defendant's motion for partial summary judgment is denied since we do not consider a partial summary judgment necessary or desirable at this time.

The cause is remanded to the trial judge for further proceedings consistent with this opinion.