**AMERICAN OPTICAL CORPORATION**

v.

**The UNITED STATES.**

No. 197–77.

United States Court of Claims.

Jan. 24, 1979.

Joel P. Shedd, Washington, D. C., for plaintiff; Harvey G. Sherzer, Washington, D. C., attorney of record; Sellers, Conner & Cuneo, Washington, D. C., of counsel.

Frances M. Green, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant; James F. Merow, Washington, D. C., of counsel.

Before COWEN, Senior Judge, and DAVIS and KUNZIG, Judges.

PER CURIAM: *

In this case, before the court for review on cross-motions for summary judgment, plaintiff contends that an administrative decision [1] disallowing so much of plaintiff's claim for an equitable adjustment, under the "Price Escalation" clause of its contract with defendant, as exceeded 10 percent of the total contract price, is "grossly erroneous as a matter of law and fact and should be reversed by this Court."

On the facts and for the reasons hereinafter set forth, it is concluded that plaintiff is entitled to recover.

## I

The factual background against which plaintiff's claims of error are to be weighed will be set forth as briefly as possible consistent with understanding of the case.[2]

The contract in suit, concerning gold-filled spectacle frames, was awarded to plaintiff June 15, 1972. During the two years preceding that award, plaintiff had been the successful bidder on four other contracts involving the furnishing to de-

---

* This opinion incorporates a large part, but not all, of the opinion of Trial Judge Harry E. Wood, with minor modification and supplementation by the court. The trial judge also passed upon another issue which we deem unnecessary to reach; we have therefore omitted all discussion of that other issue.

1. ASBCA No. 20488, 77–1 BCA ¶ 12,346. Administrative Judge Solibakke dissented.

2. The facts stated in Section I were found by the Board or are otherwise properly derived from undisputed evidence in the administrative record. See Truong Xuan Truc v. United States, 212 Ct.Cl. 51, 64 (1976); Merritt-Chapman & Scott Corp. v. United States, 528 F.2d 1392, 1398, 208 Ct.Cl. 639, 651 (1976). Additional facts thus found or derived will be set forth in connection with the arguments of the parties.

fendant of such spectacle frames.[3] Each of the four solicitations for bids leading to these contracts had contained a printed "Price Escalation" clause, applicable to the price of gold. Among other things, that clause, *as printed,* provided in substance that:

(d) Notwithstanding any other provision of this clause, any price adjustment under this clause shall be subject to the following limitations:

\* \* \* \* \* \*

(vi) The aggregate of the increases in any contract unit price under this clause shall not exceed ____ percent of the original contract unit price.

In each of the solicitations for bids leading to the award of the said four contracts to plaintiff (and in each of the four contracts), "10%" was inserted in the blank space in paragraph (d)(vi).

At the times plaintiff submitted its bids with respect to these four contracts, the price of gold was relatively stable. Throughout the first half of 1970 the price of gold was about $35.40 per ounce. In the second half of 1970, an increase in price of some 7 percent, to about $37.85 per ounce, took place. In the first half of 1971, there was a further price increase of approximately 8 percent, to about $40.90 per ounce, and in the second half of 1971 another increase of approximately 7 percent, to about $43.85 per ounce, occurred.

In 1972, however, the situation changed drastically. As the Board found, "The price of gold had been rising rapidly in early 1972. The price increased from $43.85 at the beginning of the year to $59.75 [or some 36.8 percent] on 1 June 1972. \* \* \* Articles in newspapers and trade publications commented upon the instability of the price of gold and the erratic status of the gold market, with predictions of the price of gold rising as high as $200.00 an ounce." The administrative record is clear that in May and early June 1972 plaintiff was well aware of the rapidly advancing cost of gold.[4] Moreover, plaintiff was then deeply concerned about the risks inherent in bidding on an indefinite quantities contract covering an extended period of time, with "no guarantee that [defendant] would order a specified number of frames."[5]

With the cost of gold skyrocketing, the Defense Personnel Support Center (DPSC), Defense Supply Agency (DSA),[6] Philadelphia, Pennsylvania, issued Solicitation No. DSA 120–72–B–2391 (the Solicitation) on May 11, 1972. The formally advertised Solicitation, as subsequently amended, called for sealed bids, to be opened June 6, 1972, on an estimated quantity (243,934 units) of "Frame[s], Spectacle, Bayonet Temples, 42 × 52 Eye, 20 Bridge, Gold Filled, Double Bar", with 50 percent of the above estimated quantity to be set aside for Labor Surplus Area concerns. Bids at a unit price per spectacle frame were requested.

The Solicitation contemplated an indefinite quantities contract requiring the furnishing, when and if ordered, of spectacle frames up to and including the estimated quantity. All deliveries of such spectacle frames were to be made pursuant to orders issued by DPSC during the period commencing July 1, 1972 and ending June 30, 1973, with supplies covered by any such order to be delivered within 120 days from

---

3. Each such contract called for a firm, fixed quantity of gold-filled spectacles.

4. By July 1, 1972, the price of gold was $64.30 per ounce, or nearly 50 percent more than on January 1, 1972. During the next 18 months, the price of gold continued to increase, finally becoming over $100.00 per ounce.

5. In these circumstances, the Board concluded, plaintiff could not reasonably "be expected to order immediately all of the gold necessary to fulfill the contract." In short, if awarded such a contract, plaintiff could not protect itself against further escalation in the price of gold by procuring, shortly after contract award, the amounts it *might* need to perform the contract.

6. DPSC was a "procuring activity" for the Defense Supply Agency, and DSA was a "military department" of the Department of Defense. ASPR §§ 1–201.5, 1–201.6, 1–201.14, 32 CFR §§ 1.201–5, 1.201–6, 1.201–14 (1972).

the date of the order.[7] The Solicitation imposed minimum (5,000 units) and maximum (60,984 units) individual delivery order limitations, but it did not specify any minimum or maximum number of delivery orders, nor did it specify any minimum number of spectacle frames DPSC was required to order under the contemplated contract.

The Solicitation contained standard General Provisions, including the Disputes clause. It also contained "PAYMENT OF INTEREST ON CONTRACTORS' CLAIMS (1972 Feb)"[8] and three "Price Escalation" clauses.

The major one of these clauses, "D20.81, PRICE ESCALATION (DPSC 1969 JUN)"[9] (hereinafter, the Escalation clause) required plaintiff to warrant that the price set forth in the "contract does not include any contingency allowance to cover the possibility of increased costs of performance resulting from increases in the price of * * *" gold; provided that should plaintiff be required to pay prices for gold "in excess of or less than the price for such materials as quoted in the Wall Street Journal, per ounce, on the date of bid opening" an upward or downward equitable adjustment in contract price would "be negotiated * *"; and contained, among other limitations, paragraph (d)(vi); this paragraph provided that "The aggregate of the increases in any contract unit price under this clause shall not exceed ____ percent of the original contract unit price." In the Solicitation as issued, the "____ percent" portion of paragraph (d)(vi) did not contain any percentage figure.

The other two "Price Escalation" clauses in the Solicitation were "D20.82, EVALUATION OF BIDS SUBJECT TO ESCALATION (1960 APR)" (hereinafter Clause 20.-82) and "D30.84 PRICE ESCALATION (DPSC 1969 May)" (hereinafter Clause 30.-84). Clause 20.82 provided in part that bids would be evaluated on the basis of quoted prices without "the allowable escalation being added", that bids which "provide for a ceiling lower than that stipulated in the clause will also be evaluated on this basis", and that bids providing for escalation exceeding the "maximum escalation stipulated in the clause", or limiting or deleting downward escalation, would be rejected as non-responsive. Clause 30.84 restricted materials subject to price escalation to gold only, and reflected the quantity of gold subject to such escalation to be .0245 troy ounces per unit.

In May 1972, plaintiff's pricing coordinator was responsible for handling the processing of plaintiff's government contract bids, including the assembly of data necessary for the computation of a bid price. For a procurement of the magnitude of that here involved, however, he could not make a final bidding decision. At the time, bidding decisions were made by a group consisting of the comptroller[10] of plaintiff's Optical

---

7. The Board stated that defendant thus could not require deliveries under the contract after October 31, 1973, but nonetheless found (with support in the administrative record) that final delivery under the contract was made February 25, 1974. The Board opinion casts no light on this situation, and neither party explains it.

8. That clause provides as follows:

"(a) If an appeal is filed by the Contractor from a final decision of the Contracting Officer under the DISPUTES clause of this contract, denying a claim arising under the contract, simple interest on the amount of the claim finally determined owed by the Government shall be payable to the Contractor. Such interest shall be at the rate of six per cent (6%) per annum from the date the Contractor furnishes to the Contracting Officer his written appeal pursuant to the DISPUTES clause of this contract, to the date of (i) a final judgment by a court of competent jurisdiction, or (ii) mailing to the Contractor of a supplemental agreement for execution either confirming completed negotiations between the parties or carrying out a decision of a Board of Contract Appeals. "(b) Notwithstanding (a) above, (i) interest shall be applied only from the date payment was due, if such date is later than the filing of appeal; and (ii) interest shall not be paid for any period of time that the Contracting Officer determines the contractor has unduly delayed in pursuing his remedies before a Board of Contract Appeals or a court of competent jurisdiction."

9. Clause D20.81 as issued was on a printed form.

10. The comptroller followed the gold market very closely, and was then aware of predictions of a $200 per ounce (or higher) price for gold (and of the escalation in the price of gold that had thus far occurred in 1972 as well).

Products Division, the general manager of that Division, and the general manager's assistant.

When plaintiff's pricing coordinator received the Solicitation, he noted that paragraph (d)(vi) of the Escalation clause did not contain any percentage figure in the blank space therein. He was aware that in previous solicitations the said clause had contained a 10 percent limitation on price escalation. Although plaintiff's comptroller did not actually see the Solicitation itself, he was advised that there was a blank space in paragraph (d)(vi). Plaintiff's management concluded that in light of the highly erratic status of the gold market at that time (and of predictions that the cost of gold would continue to increase markedly), defendant had intentionally left the said space blank, in order to permit escalation (as to gold) without any specific ceiling limitation.[11] Plaintiff did not make any inquiries to defendant concerning the blank space in paragraph (d)(vi).

In the Board's words, plaintiff's bid (based upon purchasing gold at $59 per ounce) was "based upon the premise that the Escalation clause was not subject to a 10 percent ceiling."[12] In this connection, the Board's finding that plaintiff's management was "strongly opposed" to submission of a bid under a solicitation that had a 10 percent ceiling on escalation due to increases in the cost of gold understates the record.[13] The undisputed evidence is that plaintiff's comptroller instructed its pricing coordinator that, should the Solicitation contain any such limitation, DPSC was to be notified that plaintiff was not interested in submitting a bid pursuant to the Solicitation.

On June 15, 1972, defendant, acting through DPSC, awarded to plaintiff an indefinite quantities contract (DSA 120–72–D–3559) to furnish, when and if ordered, an estimated total quantity of 121,967 gold-filled spectacle frames at a unit price of $3.89 each.[14] The contract included a note reflecting that each unit would contain .0245 troy ounces of gold, and that the Wall Street Journal price for gold on June 6, 1972, was $59.80 per ounce. By Modification P00001, effective June 19, 1972, plaintiff was awarded an additional estimated quantity of 121,967 units at the same unit price, pursuant to the Labor Surplus Area set aside provisions of the Solicitation. In the contract as awarded, paragraph (d)(vi) of the Escalation clause continued to contain the blank space described above. The contracting officer was, however, unaware of that fact; indeed, as will be seen, he did not become aware of it until some months after plaintiff's completion of deliveries under the contract.[15]

During the contract period, DPSC issued five delivery orders (dated, respectively, August 17, 1972, September 21, 1972, April 11, 1973, May 22, 1973, and June 12, 1973) calling for an estimated quantity of 273,653 spectacle frames. Plaintiff actually delivered a total of 279,125[16] spectacle frames,

---

11. The Board found that the pricing coordinator "assumed that the Government was as concerned as the manufacturers about the gold situation and expected no bids from the two potential suppliers if the Government imposed a 10 percent ceiling or any other limitation on escalation; and * * * accepted that as the reason for the blank in the clause"; the comptroller "concluded that leaving this space blank was the only way that the Government could get a bid from any manufacturer on the product."

12. In fact, plaintiff submitted its bid (under date of June 2, 1972) on the understanding that there was *no* ceiling on escalation.

13. Elsewhere in its opinion the Board referred to the "fact" that plaintiff "would have refused to accept a contract bearing a 10 percent or even a 25 percent ceiling * * *."

14. Plaintiff's estimated unit cost, for bidding purposes, was $3.614 (using, as the cost of gold, a figure of $59 per ounce). Its unit bid price thus reflected only a 7 percent gross margin over such estimated unit cost.

15. It is logical to infer from this the absence of an inquiry from *any* prospective bidder to the contracting officer concerning the blank space in paragraph (d)(vi).

16. A permissible variation in delivered quantity of plus or minus 2 percent was authorized by the contract.

completing deliveries under the contract February 25, 1974.

On March 26, 1974, plaintiff submitted a claim, under the Escalation clause, for an equitable adjustment of $230,562, the amount by which plaintiff's cost of gold purchased in making deliveries under the contract was claimed to have exceeded the market price for gold on June 6, 1972, the date of bid opening.[17] The said claim was processed by the Administrative Contracting Officer (ACO) at Defense Contract Administrative Services Region (DCASR), Boston, Massachusetts. By letter dated June 17, 1974, to DPSC, the ACO recommended allowance of the claim in the amount of $217,297, but added that the ACO "assumed" the Escalation clause limited the increase of any contract unit price to 10 percent of the original contract unit price, and that, "Therefore, $108,579.62 would be the aggregate contract increase adjustment." The said letter served to bring to the attention of DPSC's contracting officer, for the first time, the fact that paragraph (d)(vi) did not contain any limiting percentage figure.[18]

On August 2, 1974, DPSC's contracting officer issued a "Determination and Findings" in which he stated, in substance, that plaintiff had incurred additional costs of $210,359.69 for gold "over and above that upon which the Contract price was based", that plaintiff would be entitled to reimbursement in full "if the [Escalation] clause cited a 25% limit in lieu of the usual 10% * * *", and determined that the contract should be modified to include "a price esca-

lation limit of 25% to permit full re-imbursement of the Contractor for his increased gold costs." The contracting officer's Determination and Findings were approved by the Chief, Division of Procurement and Protection, Directorate of Medical Material, DPSC. By Modification P00003, effective August 12, 1974, executed by plaintiff's price coordinator August 20, 1974, and by DPSC's contracting officer August 27, 1974, paragraph (d)(vi) of the Escalation clause was modified to read as follows:

The aggregate of the increases in any contract unit price under this clause shall not exceed 25% of the original contract unit price.[19]

By letter dated August 8, 1974, to DCASR, DPSC's contracting officer stated that the Escalation clause "is being modified to cite a 25% price escalation limit", and requested that DCASR negotiate a price adjustment with plaintiff. Following further review, DCASR did negotiate with plaintiff concerning an equitable adjustment, recommended the allowance of an additional $4,227.31 because of errors in the initial computations, and proposed a final settlement of $214,587.

The contracting officer's August 2, 1974 reference to "the usual 10%" ceiling, Modification P00003 (purporting, at least, to include in plaintiff's contract a 25 percent ceiling), and subsequent administrative developments in the matter (including the Board's conclusion that the equitable adjustment due plaintiff, under the Escalation clause, was limited to 10 percent of the

17. By letter dated April 22, 1974, to DCASR, plaintiff revised its claim downward to $217,297.

18. The Board opinion indicates that by letter dated July 2, 1974, to DPSC's contracting officer, DCASR recommended "that 25 percent be inserted in the blank space." There is nothing in the record to support that statement. The July 2, 1974 letter referred to was from the contracting officer to another office in DPSC, and indicated that, should that office concur with "DCAS findings and recommendations, I will take appropriate action to obtain the Division Chief's approval on increasing the escalation limit to 25% * * *."

19. Section 26–151, DPSC, ASPR/DSPR Supplement DPSCM 4105.4 provided, in substance, that with exceptions not here material, all contract modifications "shall be forwarded to Office of Counsel for concurrence for legal sufficiency * * *." While Modification P00003 was not "forwarded" for legal review prior to execution, the contracting officer's implementing "Supplemental Agreements" (along with his November 13, 1964 Determination and Findings) were so forwarded and initially approved by DPSC's Office of Counsel.

total contract price) require, at this point, that the matter of the contracting officer's authority respecting escalation clauses be briefly discussed.

As in force in 1972, ASPR § 3–404.3(a), 32 CFR § 3.404–3(a) (1972) provided that where a fixed-price contract containing an Escalation clause "is agreed upon, upward adjustments shall be limited by the establishment of a reasonable ceiling * * * ",[20] and ASPR § 3–404.3(c), 32 CFR § 3.404–3(c) (1972) provided that if none of the clauses "set forth in § 7.106 or § 7.107 of this chapter" were applicable, "an escalation clause approved by the Department concerned may be included."[21]

ASPR § 7–107(b), 32 CFR § 7.107(b) (1972) included an express requirement that the "percentage figure to be used in subparagraph (d)(vi) of the clause shall not exceed 10 percent." The Board concluded, however, that ASPR § 7–107 was inapplicable to plaintiff's contract, and the propriety of that ruling is both clear and here unquestioned. ASPR § 7–106, 32 CFR § 7.106 (1972), was also inapplicable as well.

In February 1969, DSA authorized DPSC to use in formally advertised contracts an Escalation clause adapted from ASPR § 7–107. On March 4, 1969, a written request that the adapted clause (identical in text with the Escalation clause in plaintiff's contract, including the blank space in paragraph (d)(vi) thereof) be incorporated into DPSC's Clause Manual, for use in medical invitations for bids for items containing gold, where the contracting officer expected that firm fixed-price bids would unnecessarily restrict competition or unreasonably increase bid prices, was made by the Chief, Contract Review Office, Directorate of Procurement and Production, DPSC.

The administrative record contains six Rule 4 documents designated by defendant's chief trial attorney as "DPSC Handbook Clauses" and containing (among other things) the text of an Escalation clause.[22] The text of the said clause (including a blank space in paragraph (d)(vi)) remained unchanged throughout. The first three documents (dated July 1, 1969, November 26, 1969, and June 30, 1970, respectively) did not contain or refer to any "Authority" prescribing any ceiling limitation on escalation, nor is there in the administrative record any other evidence of the existence at those times of such a ceiling applicable to the type of contract here in suit. Parenthetically, none of the three documents, nor the fourth, of more importance here, contained any reference to DPSC. None of these four documents even indicated that it was taken from a Handbook of Clauses or a Clause Manual.

The fourth document (dated October 19, 1970) also neither contained nor referred to any "Authority" prescribing a ceiling limitation on escalation. This document did, however, contain a "Note" stating as follows: "The percentage figure to be used in Paragraph (d)(vi) of the clause shall not exceed 10%." The fifth document (dated

---

**20.** Plaintiff did not have actual knowledge of this provision at the time it responded to the Solicitation, but is, of course, chargeable with constructive notice of it. *Cf. Porter v. United States,* 496 F.2d 583, 590, 204 Ct.Cl. 355, 366 (1974), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975); *AMCO Electric v. United States,* 493 F.2d 647, 650, 204 Ct.Cl. 24, 31 (1974). Plaintiff had neither actual nor constructive notice of any DSA or DPSC pronouncements respecting any ceiling for use in the Escalation clause.

**21.** ASPR § 2–104.3, 32 CFR § 2.104–3 (1972) permitted fixed-price contracts with escalation in appropriate cases, to protect the interests of both a contractor and the government, with any escalation clause to "provide an escalation ceiling identical for all bidders so that each bidder is afforded an equal opportunity to bid on the escalation basis."

**22.** Each of the six documents contained these headings:

CLAUSE [followed by title]
WHEN USED
AUTHORITY
OPERATING PROCEDURES
PREPRINTED FORMS
TEXT OF CLAUSE [followed by Text]

As will be seen, three of the six documents also contained an additional heading, "Note", followed by a comment. The last two of the six, dated February 8, 1974 and August 7, 1974, respectively, bear the caption "DPSC Handbook of Clauses".

February 8, 1974) repeated the same sentence, but added that "Commander, DPSC may approve escalation percentages up to 25 percent. Any percentage over that amount must be approved by HQ DSA."[23] The sixth document (dated August 7, 1974) simply changed the title of the clause, replaced the word "shall" by "should", and substituted the Director, Office of Procurement and Production Policy, for the Commander, DPSC.

DPSC's contracting officer testified administratively that, had he been aware of the blank space in paragraph (d)(vi) of the Escalation clause prior to bid opening, he would have modified the Solicitation by inserting 10 percent in the said blank space. As noted above, however, in August 1974, after discovering that paragraph (d)(vi) had a blank space, the contracting officer executed Modification P00003 inserting 25 percent in the blank space. He also then requested that DCASR–Boston negotiate a settlement of plaintiff's equitable adjustment claim on that basis; and, under date of November 13, 1974, he executed a document entitled "Determination and Findings of the Contracting Officer", reflecting, inter alia, that plaintiff "has incurred additional costs totalling $214,587.00 in accordance with the price escalation provisions of the contract and is therefore entitled to reimbursement for same."

Under date of November 13, 1974, the contracting officer also signed and referred to "DPSC–APH", "DPSC–AP", "DPSC–A", "DPSC–LM", and the Claims Review Board,[24] an Internal Publications Coordination Record captioned "Review of Supplemental Agreements for Delivery Orders # 0001 through 0005 against Contract DSA 120–72–D–3559". The contracting officer enclosed therewith his November 13, 1974 Determination and Findings,[25] and attached "Supplemental Agreements" which, on execution, would "permit reimbursement of $214,587.00 to the contractor in accordance with the price escalation provisions of the contract." With one exception, to be noted infra, the head of each DPSC element to which the said document was so referred (including the Office of Counsel) concurred with the contracting officer's said Determination and Findings.

The contracting officer's November 13, 1974 "Review" and enclosures reached the Contract Review Office, Office of Procurement and Production Policy, DPSC, December 2, 1974, and was "immediately discussed with Commodity Counsel * * * on 2 December as it appeared that the contracting officer had no authority to issue Modification P00003 or the proposed escalation settlements." On January 10, 1975, the Office of Counsel notified the contracting officer of withdrawal of its "previous concurrence in the legal sufficiency of the instant modifications to delivery orders—0001 thru —0005", and expressed the view that the contracting officer lacked authority to "enter into the above-referenced Supplemental Agreement since the applicable regulations in effect on date of contract award proscribed an escalation ceiling in excess of 10%."

---

**23.** The authority (DSAH–PPR PROCLTR 73–36A, December 7, 1973) cited for the addition provided in pertinent part that "The ceiling limitation of 25% on special escalation clauses is continued in force * * *." DSAH–PPR Procltr 73–36, October 25, 1973, "Use of Price Escalation * * * Clauses", indicated (inter alia) that while most ASPR standard escalation clauses were limited to a 10 percent price escalation ceiling, "This is not true, however, of special escalation clauses approved by the Department concerned. An escalation ceiling has to be included in special escalation clauses, but there is nothing in ASPR limiting the ceiling in such clauses to 10%." (Emphasis supplied.) It is unnecessary here to consider whether the added sentence in the February 8, 1974 document represented a valid interpretation of the two 1973 DSAH–PPR Procltrs cited.

**24.** DPSC–APH was the Chief, Hospital Equipment Branch, Procurement and Production Division, Directorate of Medical Materiel; DPSC–AP was the Chief, Procurement and Production Division, Directorate of Medical Materiel; DPSC–A was the Director of Medical Materiel; DPSC–LM was the Office of Counsel.

**25.** The said findings included the contracting officer's issuance of Modification P00003 "on 12 August, 1974 establishing an escalation limit of 25% of the original contract unit price."

Thereafter, the Claims Review Board approved the issuance of a modification allowing payment to plaintiff of $108,579.63 on its escalation claim, with the remainder of the amount claimed ($106,007.37) to be withheld pending resolution of the dispute. Plaintiff has in fact been paid $108,579.63 on the express understanding that such payment "shall not preclude the Contractor from pursuing its claim for a further upward adjustment under Clause D20.81 * * *" to the extent of $106,007.37.

On June 6, 1975, the contracting officer, "with the approval of his superiors" (in the Board's phrase), rendered a final decision under the Disputes clause denying so much of plaintiff's claim as exceeded $108,579.63. Plaintiff timely appealed that decision to the Board.[26] By decision dated January 7, 1977, the Board denied the appeal by a three-to-one vote, and this action followed.

## II

In denying plaintiff's claim, the Board held that, at the times of issuance of the Solicitation and of contract award, "the DPSC handbook of clauses, which the contracting officer was required to follow, provided that the percentage figure to be used in paragraph (d)(vi) of the Escalation clause should not exceed 10 percent"; and that the contracting officer was in mid-1972, "under a requirement of the DPSC instructions to include no more than a 10 percent ceiling in the Escalation clause." These so-called "findings" were the basis for the Board's conclusion that Modification P00003 (pursuant to which the contracting officer modified paragraph (d)(vi) of the Escalation clause by inserting "25%" in the blank space therein) could not, "to the extent that it allowed more than 10 percent * * * be enforced against the Government."

At the Board, defendant asserted as one of several affirmative defenses that "At all times prior to bid opening the Contracting Officer was without authority to place an amount greater than 10 percent in said paragraph (d)(vi)." Plaintiff requested that defendant's chief trial attorney include in the administrative record "all regulations, orders, directives, correspondence with higher authority, and intra-office memoranda relating to the authorization to use the Escalation Clause included in [plaintiff's] contract and imposing restrictions on its use." During the administrative hearing, defendant's chief trial attorney affirmatively indicated that the administrative record (supplemented by the contracting officer's warrants of appointment) "now contains all relevant documents which relate to the authority of the [contracting officer] in this appeal * * *."

Plaintiff contends that, on that record, the Board's conclusion that the contracting officer's authority in mid-1972 to enter into contracts containing an Escalation clause of the kind here involved was limited by "instruction" establishing a percentage ceiling on escalation of 10 percent or less is legally and factually defective. Defendant, of course, disagrees. Plaintiff's contention is valid.

█ The contracting officer was obviously "subject to the limitations contained in the Armed Services Procurement Regulation * * *," and while he was not subject to any "Contractual Authority Monetary Limitation", the terms of his warrants of appointment specified that he was also bound by "Limitations set forth in the Defense Supply Procurement Regulation and applicable instructions of the Defense Personnel Support Center."[27]

█ At the time here relevant, and in solicitations like that here involved, containing a gold Escalation clause, the contracting officer was undoubtedly required to utilize the *text* of the clause actually placed in plaintiff's contract. DSA had authorized DPSC to use that clause in formally advertised procurements for items containing

---

**26.** Plaintiff's notice of appeal was received by the contracting officer June 24, 1975. *See* n. 8, *supra*.

**27.** Defendant does not contend that either an ASPR or a Defense Supply Procurement Regulation escalation ceiling limitation was directly applicable to plaintiff's contract.

gold in February 1969. However, neither DSA's 1969 letter of authorization nor a March 1969 formal written request within DPSC that the approved clause be incorporated in DPSC's clause manual made any reference whatever to a percentage ceiling on escalation. Indeed, the clause approved by DSA actually contained a blank space in paragraph (d)(vi).

[redacted] The precise problem here, then, is not whether the contracting officer was bound to use an Escalation clause in the particular form approved by DSA, as he did here, but whether, at the time he included that Escalation clause in the contract here involved, he was also subject to any DPSC "instruction" prohibiting the inclusion in paragraph (d)(vi) of the clause of an escalation ceiling in excess of 10 percent. The latter question requires a negative answer.

Defense Supply Procurement Regulation (DSPR) § 1201–108, 32 CFR § 1201.108 (1972), as in force at the time here relevant, authorized the head of DPSC to issue "DSPR and ASPR implementations," but required that "one copy of each implementing instruction" be transmitted to DSA. See also DSPR § 1201–104.50, 32 CFR § 1201.104–50 (1972); DSPR § 1201–402(a)(4), 32 CFR § 1201.402(a)(4). It is clear from these provisions that, reading DSPR as a whole, the word "instructions" had some considerable significance within both DSA and DPSC.

In light of plaintiff's prehearing demand for production of documents, and defendant's representation at the hearing concerning the completeness of the administrative record, the conclusion that the record contains all of the relevant documentary evidence on the crucial subject of limitations on the contracting officer's authority in the area of price escalation ceilings is impelled. Pretermitting those documents next to be discussed (and whose character remains to be considered), the record is devoid of any pertinent "instructions" on that subject.

The administrative record contains six documents described by defendant's chief trial attorney as "DPSC Handbook Clauses"; each contains the text of an Escalation clause (with a blank space in paragraph (d)(vi)) identical to that in plaintiff's contract. The first four of these documents, relevant here, were dated July 1, 1969, November 26, 1969, June 30, 1970, and October 19, 1970, respectively.[28] None of these four documents contains any reference to DPSC, and none reflects that it was taken from a Handbook of Clauses or a Clause Manual.

The first three documents neither contain nor refer to any "authority" prescribing any ceiling limitations on escalation. The fourth bears this "Note": "The percentage figure to be used in Paragraph (d)(vi) of the clause shall not exceed 10%." There was, however, no change in the "authority" portion of the October 19, 1970 document; more precisely, the October 19, 1970 document, like the other three lacked any reference to an "authority" prescribing such a ceiling limitation.

Defendant asserts that a 10 percent ceiling "was implemented by DSA" through its February 1969 letter to DPSC and a March 1969 teletype. There are insuperable difficulties with that argument. Neither DSA's February 1969 letter, nor the March 1969 teletype, prescribes, or even suggests, a 10 percent (or any other) ceiling limitation on escalation. Moreover, none of the three documents referred to above, each of which is dated after March 1969, reflects the ceiling defendant sees as having been earlier "implemented", notwithstanding explicit reference in those documents to the supposedly implementing letter and teletype.

The asserted 10 percent escalation ceiling limitation on the authority of the contracting officer here depends, then, solely and entirely upon the efficacy of the October 19, 1970 "Note". The administrative record contains no other documentary evidence requiring, authorizing, justifying, prescribing, or even mentioning, as of 1972, and for the kind of contract here in suit, a 10 percent ceiling limitation on escalation. Neither a stated reason for the establishment of such a ceiling in October 1970, the identity of the

28. The fifth and sixth such documents were dated in 1974, long after contract award.

promulgator of the October 19, 1970 "Clause" in which the "Note" appears, nor the identity of the source or author of the "Note" can be found in that record.

The record does include testimony that a DSA procurement analyst (who did not testify at the administrative hearing) called an unidentified DPSC employee, *in May 1969*, with "a request to codify the obvious." Since the "Note" referred to above did not come into existence until October 19, 1970, the testimony is highly suspect, and perhaps for this reason the Board opinion makes no mention of it. In any event, however, there is no evidence that any such "request",[29] if made, was authorized by or known to any official at DSA with power to issue instructions, or approved by or known to any such official at DPSC. The witness who described the telephone call did testify that in making it the DSA procurement analyst did not act under a delegation of authority from the Director, DSA.

If the relevant (*i. e.*, the October 19, 1970, and three earlier) excerpts from the "DPSC Handbook of Clauses" were *not* DPSC "instructions" binding on the contracting officer, it necessarily follows that there was no stated percentage limitation on his authority respecting a price escalation ceiling for a mid-1972 contract of the kind here involved. Indeed, the Board, by broadly concluding that the "Handbook of Clauses" amounted to binding "instructions",[30] in effect so recognized.

Assuming, however, that the first (and the second and third) documents described as "DPSC Handbook Clauses" *were* DPSC "instructions" binding on the contracting officer, as the Board held, those documents clearly contained no stated percentage limitation for use in connection with the Escalation clause approved by DSA (with a blank space in paragraph (d)(vi) thereof) in 1969. It is simply inconceivable that a con-

tract clause approved by DPSC's superior agency, DSA, and official DPSC "instructions" could validly be modified (and a theretofore nonexistent limitation on the contracting officer's authority respecting use of the Escalation clause imposed) by a mere "Note" unidentified as to reason, source, or author, unsupported by any citation of authority, and wholly devoid even of any supporting documentation. And, this sound conclusion is strengthened by consideration of the DSPR provisions cited hereinabove.

■ In this state of the record, the "Note" in the October 19, 1970 excerpt cannot be deemed a valid DPSC "instruction" limiting the authority of the contracting officer. While the Board's broad holding did not focus on that "Note", the said holding necessarily upheld its validity, and is therefore erroneous as a matter of fact and law.

■ It should perhaps be noted that the contracting officer, not an attorney, did testify that he was required to follow the Handbook of Clauses,[31] and that, at the time here relevant, his "limit or authority rather was 10%." All else aside, the contracting officer was clearly not competent to testify that, as a matter of law, the October 19, 1970 excerpt containing the "Note" in question was a binding DPSC "instruction", or that the "Note" itself had any legal efficacy. On this record, that unsupported and conclusionary testimony does not support the existence of such a limitation on the contracting officer's authority.

Defendant alludes to a "general ASPR policy" limiting the percentage ceiling in Escalation clauses "similar to plaintiff's" to 10 percent. That allusion is misleading. Neither ASPR § 7–107 nor any other ASPR

---

**29.** The witness who described the May 1969 telephone call differentiated between an "instruction by an official who is superior to you, and it requires you to perform in accordance with the instruction as opposed to a request, which is discretionary."

**30.** None of the documents in the administrative record declare the "Handbook" to be a DPSC "instruction".

**31.** The administrative record contains no written DPSC "instruction" (or documentation) to that effect.

provision prescribing such a ceiling, was applicable to plaintiff's contract.[32] Nothing in ASPR limited the ceiling in a special Escalation clause approved by the Department concerned to 10 percent, and plaintiff's contract contained a special, not an ASPR, Escalation clause. Defendant's charge that "applicable law * * * limited the ceiling to 10 percent" is wholly unsupported.

Defendant's suggestion that plaintiff complains about the absence from the record of "a written communication which indicated DSA's permission to DPSC to include the 10% escalation ceiling in its Handbook of Clauses" is unfounded. Plaintiff contends, not that defendant should have produced any such document, but (1) that the record does not establish that the Handbook of Clauses was an "instruction", (2) that the origin of the "Note" said by defendant to be a DPSC "instruction" is wholly unexplained by the administrative record, and (3) that nothing in the record even suggests that any governmental official with the power to issue such an "instruction" authorized, approved, or even knew of it. At least the latter two contentions are valid.

The Board also held that the parties to the contract could, even after contract award, amend paragraph (d)(vi) "to conform to the Government's requirements", but that plaintiff could not thereby be allowed "a greater percentage limitation than could and would have been allowed in the solicitation for bids." In the Board's view, in inserting (by Modification P00003) "25 percent in the blank in the ceiling clause, the contracting officer agreed to allow a benefit to [plaintiff] which he would not and could not have allowed in the original contract." The Board went on to say that, to the extent the said modification allowed in excess of 10 percent, it could not be enforced against defendant. The Board holding as to what could have been allowed is, as stated hereinabove, erroneous. Its

conclusion as to what the contracting officer would have done was reached in light of his, and the Board's, erroneous view as to existing limitations on his authority.

On this record, the only ceiling limitation applicable to the Solicitation leading to plaintiff's contract was that prescribed by ASPR § 3–404.3(a), 32 CFR § 3.404–3(a) (1972), requiring the establishment of a "reasonable ceiling". Plaintiff insists that a ceiling limitation on escalation of less than 25 percent would have been unreasonably low. The terms of Modification P00003 tend to confirm that view. The Board did not make any findings with respect to a "reasonable ceiling". The record is very clear, however, that escalation of 25 percent would not, in the circumstances we have here, exceed the "reasonable ceiling" limitation of ASPR; there is no substantial evidence to the contrary.

■ We hold therefore that there was authority to enter into Modification P00003 which was signed both by defendant's contracting officer and by plaintiff in August 1974, and was made effective on August 12, 1974. This modification and the implementing supplemental agreement were later disapproved within DSPC but solely on the erroneous legal ground that the contracting officer had no authority to allow escalation beyond 10 percent.[33] Since this disapproval was legally erroneous, we are entitled to disregard it as ineffective. We rule therefore that Modification P00003 was validly made and is enforceable by the plaintiff. Whatever plaintiff's rights would have been if the modification had not been made, the fact is that the defendant validly entered into the modification, with the contractor's concurrence. The modification is itself a contract which can be vindicated by this suit. Under that modification plaintiff is entitled to the amount it claims here if its escalated costs fell, as they do, below the 25 percent escalation ceiling.

---

**32.** ASPR § 3–404.3(a), 32 CFR § 3.404–3(a) (1972), did require that a "reasonable ceiling" be established.

**33.** There is no suggestion that the modification (or the supplemental agreement) was unsatisfactory in any other respect.

Before the Board, the parties stipulated and agreed that plaintiff's "increased costs of gold above the price on date of bid opening incurred by" plaintiff in the course of contract performance amounted to $214,587, and that defendant had paid to plaintiff the sum of $108,579.63 on the said claim. Plaintiff is accordingly entitled to the difference between the two sums, or $106,007.37. Pursuant to the contract's Interest clause, plaintiff is also entitled to interest thereon at the rate of 6 percent per annum from June 24, 1975 to date of "final judgment by a court of competent jurisdiction * * *."

The Interest clause further provides, however, that interest shall not be payable "for any period of time that the Contracting Officer determines the contractor has unduly delayed in pursuing its remedies before a Board of Contract Appeals *or a court of competent jurisdiction.*" (Emphasis supplied.) While there is presently no suggestion of any such undue delay, the terms of the Interest clause would appear to contemplate a possible administrative denial of interest for a period of time in consequence of undue delay occurring after the Board decision herein.

In the circumstances, it is concluded that plaintiff's motion for summary judgment should be granted, and that defendant's cross-motion for summary judgment should be denied. It is further concluded that, without prejudice to the right of the parties "to stipulate or otherwise agree upon a computation" of the amount due plaintiff herein (Rule 131(c)(2)), proceedings in this court should be stayed for a period of 6 months; the case should be remanded to the Board, pursuant to, and subject to the terms of, Rule 149, for determination of the equitable adjustment due plaintiff; and the attorney for defendant should be designated to furnish the advice of administrative action required by Rule 149(f).